## BETTY ANN JACKSON *v.* STATE OF MARYLAND

[No. 585, September Term, 1975.]

*Decided June 4, 1976.*

The cause was argued before MORTON, GILBERT and LOWE, JJ.

*Jack E. Richards, Assigned Public Defender,* for appellant.

*Gilbert H. Robinette, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Steven Sacks, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

Having been convicted by a jury sitting in the Criminal Court of Baltimore of manslaughter, the appellant, Betty Ann Jackson, was sentenced to a term of ten years in the custody of the Commissioner of Correction. In this appeal it is contended that the trial judge improperly instructed the jury with respect to the law of self-defense.

Ms. Jackson testified that in March, 1972, she and the victim, Charles Breedlove, were living together in Baltimore City, although he was married to another woman at the time. On March 11, 1972, they moved to Florida where they took up residence with Breedlove's mother. In June, 1972, Ms. Jackson returned to Baltimore and lived with her mother. Breedlove remained in Florida until August, 1972, at which time Ms. Jackson sent him plane fare and he returned to Baltimore. He arrived on August 3, 1972, and moved into the home occupied by Ms. Jackson and her parents. Ms. Jackson testified that since her mother objected to Breedlove living at their home, she told Breedlove on Monday, August 14, 1972, he could no longer stay in her house and gave him $200 with which to rent an apartment.

The following evening (Tuesday) she encountered Breedlove's wife in Little Willie's Tavern where the wife was employed. After she advised Mrs. Breedlove that she had given him $200 to find an apartment, Mrs. Breedlove told her that Breedlove had spent the night and most of the day with her. Ms. Jackson testified that she then left the tavern and shortly thereafter ran into Breedlove as she approached her home. A heated argument ensued, according to Ms. Jackson, during which Breedlove pulled out a pistol. As she "broke off and ran" into the street, she heard two shots and immediately thereafter she was hit by a passing automobile.

She was taken to the hospital by ambulance and while being treated, Breedlove arrived. Following her treatment they returned to her home where they spent the night together. She agreed, at Breedlove's request, not to tell the police that Breedlove had threatened her with a pistol.

The next morning (Wednesday) Ms. Jackson returned to the hospital to pick up a prescription, but before doing so, she gave Breedlove an additional $90 to assist him further in finding an apartment. It turned out later that he used the money to buy heroin.

She did not again encounter Breedlove until he arrived at her home about 2 a.m. Thursday morning. She awakened to find him "undressing and he put this gun on the dresser. I asked him what was that for. He said not to worry about it, don't touch it, it's loaded. He stayed there that night, that's all." About 8 a.m. that morning her employer telephoned her that she need not report for work since her hand had been broken in the automobile accident. She then went to a drug store "for pain pills and nerves." Thereafter, she went to Little Willie's Tavern and was surprised to find Mrs. Breedlove "because she works nights." Mrs. Breedlove inquired about her broken hand and after Ms. Jackson had explained that it resulted from her difficulties with Breedlove, the wife offered to go back to the house with her to "kind of try to straighten myself [Ms. Jackson] out." According to Ms. Jackson, "I told her I'd appreciate if she would because my mother wanted Charles out of the house before she came back to work that day. * * * [S]he didn't want him in the house. He refused to leave."

Upon their arrival at the Jackson home, they found Breedlove in the second floor bedroom. Ms. Jackson told him she knew "where he had been at" and "what happened to the money. I could not go along with this any longer." Ms. Jackson stated that "Mrs. Breedlove then said we all should just settle this, doesn't make any sense, you know, just get it straightened out." Mrs. Breedlove then proceeded to leave.

Ms. Jackson then described what happened: "She [Mrs. Breedlove] started out, I turned around, went back to the

room. I got back to the room, Charles Breedlove, he said wait a minute. When I got back to the room he sprung at me, jumped off the bed and he said what did you bring her for, that's my wife. He said 'Bitch, I'll kill you.' He jumped up, was jumping where the gun was at. I grabbed the gun and I ran towards the hall. And I was trying to fire the shots out of the gun because I didn't want him to shoot me with it and we tussled. Then the next thing I know he was on top of me on the floor and I was pushing him off, all this blood was on me. I remember I went downstairs, I went in the kitchen. I was trying to call an ambulance. I called operator. In the meantime the front door was opened I guess where Mrs. Breedlove left out of the house and left the door opened. The police came in the house and ran up the steps. I left out of the house the back way. I walked down the street, down through the alley. When I was in the course of walking I remember someone said she got a gun in her hand. I just let it go." Ms. Jackson was immediately arrested and, according to the arresting officer, she announced: "I shot Charles but I didn't mean to hurt him."

Mrs. Breedlove testified that as she was leaving the house she heard two gun shots and her husband screaming "Baby, she got me, she got me." Mrs. Breedlove fled because she was afraid. In the course of her testimony she said that Ms. Jackson told her that she had purchased a gun and planned to kill Breedlove.

The autopsy report showed that Breedlove sustained three gun shot wounds and that the one in his abdomen was the cause of death.

At the conclusion of the presentation of evidence, the trial judge instructed the jury. Appellant's counsel took exception to the following portion of the instructions:

> "Now if in order to avoid possible injury the accused could have escaped by flight, that is by fleeing from the scene of the affray or the scene of the combat, if this were a possibility, then the accused was bound to resort to that method of defense before resorting to force unless the attack

upon himself was so urgent that there was no chance to flee, that to try to flee would have been futile and unavailing."

Counsel's exception took the following form:

"MR. GARRITY [Appellant's counsel]: Flight wouldn't be necessary in a person's home when she lives in her home.

THE COURT: I think even in the home if a person can get away —

MR. GARRITY: A person can stand his ground.

* * *

"THE COURT: I think that's a category where for example strangers break into the home, the occupant has a right to protect his home. I'm not sure that really fits into this category. What I'm saying a technical defense of the home instruction, I don't think it fits in this category. This is more defense of the person situation.

MR. GARRITY: Sure is.

THE COURT: I don't think I'll give any further instruction."

It is undoubtedly true, as appellant contends, that there is substantial authority for the proposition that the rule which compels a person being assaulted to retreat or seek safety by escape does not apply where an individual is assaulted in his own home. According to Clark and Marshall, *Crimes*, § 7.03, at 495 (7th ed. 1967): "In such a case he is not bound to retreat, even though by doing so he might manifestly secure his safety, but he may stand his ground and take his assailant's life if it becomes necessary."

The Court of Appeals in *Crawford v. State*, 231 Md. 354, 360 (1963), quoted with approval an extract from *Pond v. People*, 8 Mich. 150 (1860), which it termed "a leading case,": " * * * a man assaulted in his dwelling 'may use such means as are absolutely necessary to repel the assailant from his

house, or *to prevent his forcible entry,* even to the taking of life.' "

Here, the affray resulting in Breedlove's death occurred in the home of the accused, Ms. Jackson; in fact, in her bedroom. According to her testimony, she had sought to persuade him to leave her home over a period of several days and had fortified her persuasion by giving him nearly $300 to use as rent money for an apartment. That her testimony generated the theory of self-defense is self-evident. She testified: "He said 'Bitch, I'll kill you.' He jumped up, was jumping where the gun was at. I grabbed the gun and ran towards the hall. And I was trying to fire the shots out of the gun because I didn't want him to shoot me with it and we tussled." Whether the jury chose to believe or disbelieve this testimony was within their province. Her testimony, nevertheless, formed a substantial basis for her assertion that she was not guilty of unlawful homicide because she was acting in self-defense.

The trial judge apparently was of the opinion that the fact that Ms. Jackson and Breedlove were living together in her home made inapplicable the rule that an individual, when assailed in his own home, has no duty to retreat or seek escape but may stand and defend. It is true, as the state argues, some courts have held that the joint occupancy of the premises by the accused and victim takes the case out of the rule since they are, so to speak, on common ground, thus, bringing back into play the rule requiring an accused to retreat or seek escape. *See* Annot. 26 A.L.R.3d 1296 (1969). The holding in these cases is substantially predicated upon the legal right of both the accused and the victim to occupy the premises.

On the other hand, there is respectable authority that no exception to the rule of no retreat is brought about because of joint occupancy of the home. For example, Mr. Justice Cardozo, in *People v. Tomlins,* 107 N. E. 496 (1914), announced at 497-98:

"It is not now and never has been the law that a man assailed in his own dwelling is bound to

retreat. If assailed there, he may stand his ground and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home. . . . The rule is the same whether the attack proceeds from some other occupant or from an intruder. It was so adjudged in *Jones v. State* [1884], 76 Ala. 8, 14. Why, it was there inquired, 'should one retreat from his own house, when assailed by a partner or cotenant, any more than when assailed by a stranger who is lawfully upon the premises? Whither shall he flee, and how far, and when may he be permitted to return?' "

Our view of the evidence, however, makes it unnecessary at this time to determine whether Maryland should follow the rule that joint occupancy of a dwelling activates the rule of retreat or escape, since we think it perfectly clear that Breedlove was an intruder in the home without a legal right to assert his legitimate occupancy of Ms. Jackson's dwelling. Her mother, who was a legitimate occupant, had ordered him to depart. Ms. Jackson had asked him to leave, almost to the point of imploring him to do so since she gave him nearly $300 to find another place to live. We think Breedlove was, by any concept, an unwanted intruder and trespasser.

Accordingly, it was error to instruct the jury that Ms. Jackson had a duty to flee or escape from the scene if that were possible. And it was error to refuse the request of counsel to instruct the jury affirmatively that since Ms. Jackson was in her own home, she had no duty to retreat or seek escape, but was entitled to stand her ground and take her assailant's life if it became necessary.

Since we are reversing the appellant's judgment of conviction and awarding her a new trial, we do not reach the contention that the evidence was legally insufficient to sustain the conviction of manslaughter.

*Judgment reversed; case remanded for a new trial.*