PATTON FULTON GAINER *v.* STATE OF MARYLAND

[No. 20, September Term, 1978.]

*Decided October 11, 1978.*

The cause was argued before MORTON, MOORE and COUCH, JJ.

*Michael R. Malloy, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Michael A. Anselmi, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Mark Cohen, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

At a jury trial in the Criminal Court of Baltimore (Kaplan, J., presiding) appellant was convicted of murder in the second degree and was sentenced to a term of 22 years'

imprisonment. On this appeal, he assigns error principally in the trial court's refusal to grant an instruction, under the "castle" doctrine, that there was no duty on his part to retreat because appellant was in his own home. A subsidiary assignment of error is that the State improperly requested appellant, during cross-examination, to identify the victim's mother who was present in the courtroom. For the reasons stated, we find reversible error in the court's failure to grant the requested instruction.

I

Shortly after 8:00 P.M., on March 3, 1977, appellant, then 16 years of age, shot and killed Kenneth Dorsey, his sister's fiance, age 19, with a rifle. That he did so was not denied. Instead, appellant claimed that he used the weapon in self-defense.

There was evidence before the jury, adduced by the State, tending to establish the following facts:

Appellant, his brother, four sisters, and two nephews resided with their mother in a house in Baltimore City. Kenneth Dorsey, the victim, was engaged to appellant's sister, Romaine, age 18, and resided with his mother two doors away. Appellant was a student at the Harbor Learning Center; Dorsey was employed at a local "Club" where there was a bar and a package dispensary.

Dorsey left his place of employment on March 3, 1977, shortly after 6:30 P.M., following a late afternoon birthday party for a fellow employee. About one hour later, he stopped at the Gainer residence to see Romaine where he found her and the appellant, her brother, quarreling. When Dorsey intervened on Romaine's behalf, a heated argument — lasting over twenty minutes — ensued between appellant and Dorsey. The latter then left the Gainer home but returned after another twenty minutes with a carton of beer.

Upon Dorsey's return, the argument between the two young men — the subject matter of which could not be recalled by any of the witnesses — resumed. Approximately ten minutes later, appellant went upstairs; he reappeared in

a few moments bearing a .22 caliber semi-automatic rifle which he had obtained from the room of his brother Rommel. Dorsey was then standing near the front door of the residence and Romaine was nearby. Appellant descended the stairway, stopped about halfway down, raised the rifle and fired twice at Dorsey who fell to the floor. Romaine examined him, then rushed to the phone to summons an ambulance. Dorsey was pronounced dead at 10:30 P.M. at the hospital, after emergency surgery. The cause of death was a gunshot wound in the chest; he had also sustained a nonfatal gunshot wound of the left thigh.

After the shooting, appellant fled from the scene and disposed of the rifle. Later, in a telephone conversation with his mother, he was persuaded to surrender himself to the police. The police apprehended him at 2:40 A.M. on March 4th at his home pursuant to an arrest warrant.

Appellant was 5' 10" and weighed 140 pounds; the victim Dorsey was 5' 8" and weighed 126 pounds. There was no evidence that appellant had been drinking although the autopsy which was performed on Dorsey at approximately 10:30 P.M. disclosed that his blood alcohol level was .17. Medical testimony indicated that the alcohol level was decreased by the injection of intravenous fluids and blood. Notwithstanding testimony that Dorsey had been taking Valium while drinking, the autopsy failed to detect any signs of drugs.

The State's version of the case was presented through seven witnesses, including appellant's three sisters who were present at the time of the fatal shooting. In addition to Romaine, the State presented Gail, 16, and Wilvetta, 14, who had given a written statement to the police on the evening of the killing. A detective testified on cross-examination that after his arrest, appellant told the police that following the verbal altercation, Dorsey left the Gainer home and then returned; and that because appellant was apprehensive that Dorsey was armed, he became frightened and shot him. "He [appellant] said he shot the man because he thought the man had something behind his back," the detective testified.

Appellant's version of the details and circumstances of the homicide was presented through his own testimony and that of five other witnesses, including his mother and brother. According to appellant, the victim Dorsey was the owner of a .44 caliber Magnum, customarily left in his car, which on that evening was parked near Dorsey's house two doors away. Appellant further testified that after the argument, in which Dorsey was abusive of him, he became apprehensive and went upstairs to arm himself with his brother's rifle. He obtained the rifle from in back of his brother's bed and inserted two cartridges. On redirect, he quoted the victim as saying, "Come on down now. I've got something for you. I am going to kill you," and testified it was at that point that he obtained the rifle. Appellant admitted stopping halfway down the stairs and testified further that Dorsey was immediately below, near the first step, with his hands behind his back. Dorsey suddenly brought his hands forward and appellant, at that instant, squeezed the trigger, releasing the two cartridges in somewhat rapid succession. (According to the testimony of appellant's brother Rommel, the rifle was a semi-automatic which held about 20 bullets and it would continue to discharge by squeezing the trigger.)

Appellant's version of the facts was corroborated by the testimony of his friend, Preston Alderman, age 17, and another friend, Jackson Jones, age 19. The latter testified that he had seen the victim about 12 noon on the day of the shooting and he was at that time carrying a .44 automatic in a holster and also had a supply of Valium pills. The State offered a rebuttal witness, a supervisory employee at the victim's place of work, who testified in rebuttal of Jackson's testimony that Dorsey had been at the dispensary-bar all day and had remained after his 3:30 P.M. quitting time to attend her birthday party in the establishment. She also testified that she did not see him with a weapon that day and, indeed, "never saw him with a weapon at all."

The investigating police officers found no evidence that the victim was himself armed at the time he was shot.

## II

The evidence, although conflicting, fairly generated the issue of self-defense for jury consideration.[1] The trial court, pursuant to the requirement that, in a criminal case, an advisory instruction be given on every essential question or point of law supported by the evidence, included an instruction on self-defense. *See Bruce v. State,* 218 Md. 87, 145 A. 2d 428 (1958); *Peterson v. State,* 15 Md. App. 478, 498-99, 292 A. 2d 714, 726 (1972); Maryland Rule 757. The instruction included the following statement pertaining to the duty to retreat:

> *"Ordinarily a person who is attacked is required to retreat if the means of doing so are within his power and consistent with his safety. If he fails to retreat or withdraw when he could safely do so, then the killing is not excusable. On the other hand, if the peril is imminent and he cannot safely retreat, he need not do so, but may stand his ground and defend himself."* (Emphasis added.)

The court rejected appellant's requested instruction relating to immunity from the law of retreat, submitted by trial counsel, in the following form:

> "Generally, one who is under attack may have a duty to retreat, where possible, however, when one is in his own home, there is no duty to retreat to escape the danger, but instead [he] may stand his ground and, if necessary to repel the attack, may kill the attacker. *Law v. State,* 21 Md. App. 13; *Crawford v. State,* 231 Md. 354."

Appellant specifically excepted to the court's refusal so to instruct. This was also the principal basis for appellant's motion for a new trial and, on this appeal, it is the main challenge to the judgment below. In our view, "the rule of

---

1. *Cf.* Street v. State, 26 Md. App. 336, 339, 338 A. 2d 72 (1975) (the defendant, who was charged with armed robbery, was not entitled to a self-defense instruction when he was the aggressor and the only evidence supporting the defense was a self-serving declaration that the victim had assaulted him with a pair of scissors).

non-necessity of retreat in one's own home," *Hedges v. State,* 172 So. 2d 824, 827 (Fla. 1965), should also have been covered — although not in the specific language proposed — and the failure to do so was reversible error.

Preliminarily, a brief recapitulation of Maryland law on the subject of self-defense may serve to place in proper context the precise issue presented. The Court of Appeals [2] has approved trial court instructions which have stated that:

1) The right to defend one's self is based upon necessity.

2) To justify or excuse the killing of another on that ground, the person claiming the right must not have been the aggressor or have provoked the conflict.

3) The circumstances must have been such as to afford reasonable grounds, in the mind of a person of ordinary reason, for the belief that the defendant was in such immediate danger of losing his own life or suffering serious bodily harm as to necessitate killing the deceased to save himself.

4) One not seeking a fight but reasonably apprehensive that he might be attacked, has a right to arm himself in anticipation of the assault.

5) One may not use greater force than is reasonably necessary to defend himself against attack or threat of attack by another.

6) It is the duty of the defendant to retreat or avoid danger if the means to do so are within his power and consistent with his safety; but if the peril is so imminent that he cannot safely retreat, he has a right to stand his ground and defend himself.[3]

---

2. *See* Bruce v. State, 218 Md. 87, 96-97, 145 A. 2d 428 (1958). *See also* DeVaughn v. State, 232 Md. 447, 453, 194 A. 2d 109 (1963); Crawford v. State, 231 Md. 354, 190 A. 2d 538 (1963); Gunther v. State, 228 Md. 404, 179 A. 2d 880 (1962); Guerriero v. State, 213 Md. 545, 549, 132 A. 2d 466 (1957); L. Hochheimer, *Crimes and Criminal Procedure* §§ 507, 508, 671, 681 (1897).

3. According to Perkins, the "retreat rule" has been adopted by a "substantial minority" of jurisdictions. R. Perkins, *Perkins on Criminal Law* 899 (1957). *See also* Bruce v. State, 218 Md. at 96-97; Clark & Marshall, *A Treatise on the Law of Crimes* § 7.03 (6th ed. 1958).

With respect to the proposition last stated, the so-called "retreat rule," a universally recognized exception exists: there is no duty to retreat if one is attacked in his own home,[4] if in other respects he brings himself within the ordinary rules of self-defense.[5] Premised on the common law principle that a man's home is his castle, indeed his ultimate sanctuary, the castle doctrine permits a person who is without fault [6] and is attacked within his dwelling [7] or its curtilage,[8] to stand his ground and defend himself, even if a retreat could be safely accomplished. *See generally, Naugher v. State,* 105 Ala. 26, 17 So. 24 (1895); *Hedges v. State,* 172 So.2d 824 (Fla. 1965); *Crawford v. State,* 231 Md. 354, 190 A. 2d 538 (1963); Prosser, *Law of Torts* 111-12 (1971). One who, as in the situation of the appellant, is not the head of the house but a member of the household, is within the ambit of the doctrine's protection.[9]

4. *Wharton's Criminal Law and Procedure* § 239 (Anderson 1957). The castle doctrine applies both to the defense of one's habitation and to the defense of one's person when attacked within one's home. *See generally* Law v. State, 21 Md. App. 13, 318 A. 2d 859 (1974) *appeal after remand,* 29 Md. App. 457, 349 A. 2d 295 (1975) for a discussion on the defense of habitation.

5. *See* Beard v. United States, 158 U. S. 550 (1895). One of the most important elements is that the force used not be excessive. After having decided that the situs of the crime was not defendant's dwelling, the court in DeVaughn v. State, went on to postulate that even if it were, the defendant used excessive force thereby destroying the applicability of the doctrine. 232 Md. at 454. *See also* State v. Robinson, 36 A. 2d 27 (Del. Ct. of Oyer & Terminer 1944); State v. Hewitt, 31 S.E.2d 257 (S.C. 1944); Clark & Marshall, *A Treatise on the Law of Crimes* § 7.03 (6th ed. 1958).

6. Ison v. State, 39 So. 2d 249 (Ala. 1949); State v. Hewitt, 31 S.E.2d 257 (S.C. 1944); State v. Gordon, 122 S. E. 501 (S.C. 1924).

7. *See* note 9 *infra.* In DeVaughn v. State, the court refused to accept the defendant's argument that the scene of the crime, the home of his common law wife, was his dwelling since he had another address which he gave to the police and to which he referred as home to his children. 232 Md. at 453-54. *Compare* Kelley v. State, 145 So. 816 (Ala. 1933) where the court extended the castle doctrine to a guest who was claiming self-defense after being attacked in another's dwelling.

8. Courts differ in interpreting what qualifies as being within the curtilage. *See* Beard v. United States, 158 U. S. 550 (1895) (property surrounding defendant's farm was within the curtilage); State v. Provoid, 266 A. 2d 307 (N.J. Super. Ct. App. Div. 1970) (public thoroughfare running along bounds of one's property is not within the curtilage of the home); State v. Browning, 221 S.E.2d 375 (N.C. Ct. App. 1976) (backyard, between home and storage shed, was within the curtilage); State v. Preece, 179 S. E. 524 (W.Va. 1935) (hallway outside apartment was within curtilage).

9. The Restatement of Torts Second (1965) defines a dwelling place as:

"[A]ny building or habitation, or part of it, in which the actor is at the time temporarily or permanently residing and which is in the

In the instant appeal, the record does not disclose the specific reasons why the trial court, having instructed on the duty to retreat, previously quoted, declined to give an instruction on the castle doctrine.[10] This Court, in an analogous situation, recently found reversible error when the trial court applied the duty to retreat rule although the homicide had occurred in the home of the accused. *Jackson v. State,* 31 Md. App. 518, 357 A. 2d 845 (1976). In *Jackson,* the appellant was convicted of manslaughter in the killing of her boyfriend in a house occupied by her. Speaking for the Court, Judge Morton stated:

> "[I]t was error to refuse the request of counsel to instruct the jury affirmatively that since Ms. Jackson was in her own home, she had no duty to retreat or seek escape, but was entitled to stand her ground and take her assailant's life if it became necessary."

*Id.* at 524.

It is to be noted that, in *Jackson,* the State argued that since the victim and the accused sometimes lived together, they were on "common ground," thus reactivating the rule requiring an accused to retreat or seek escape. We observed, however, a split of jurisdiction on this issue; [11] we stated that "there is respectable authority that no exception to the rule

---

exclusive possession of the actor, or of a household of which he is a member. Only that part of the building or other habitation which is actually used for residential purposes is a dwelling place. *Thus a man's house is the dwelling place of himself, his family, his servants and for the time being, the dwelling place of one who is residing, however temporarily, in the house as a guest.* It is not the dwelling place of a visitor, social or business, who comes to the house for a particular purpose and not to reside therein. The phrase 'dwelling place" includes a room or apartment in a hotel which the guest and his family are entitled to occupy exclusively. It does not include the lobbies, halls or common rooms of a hotel or apartment house." (Emphasis added.) *Id.* at § 65.

**10.** In denying appellant's motion for a new trial based on this point, the trial judge merely stated, "At the time the instructions were presented to the Court, the Court considered them, did not feel they were applicable, still does not feel they were applicable...." Discussions of instructions, at trial, between court and counsel were not on the record.

**11.** *See* Annot. 26 A.L.R.3d 1296 (1969); People v. Tomlins, 107 N. E. 496 (N.Y. 1914).

of no retreat is brought about because of joint occupancy of the home"; and we held that, at all events, the deceased was, at the time of the homicide, an intruder. *Id.* at 523.

In the instant appeal, the State asserts no similar contention based upon the status of the deceased as a social invitee. (As previously noted, Dorsey was engaged to the appellant's sister, Romaine.) Nonetheless, we consider his status an issue in the case and we, at this time, adopt the rule that when an attack occurs in one's home by an assailant who is not an intruder but who has a right to be on the premises, an assailed person who is without fault, need not "retreat to the wall" before defending himself.[12] We thus adopt the reasoning of Mr. Justice Cardozo in *People v. Tomlins,* 107 N. E. 496, 497-98 (N.Y. 1914), when he made the following oft-quoted statement:

> "It is not now and never has been the law that a man assailed in his own dwelling is bound to retreat. If assailed there, he may stand his ground and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home. . . . The rule is the same whether the attack proceeds from some other occupant or from an intruder. It was so adjudged in Jones v. State [1884], 76 Ala. 8, 14. 'Why,' it was there inquired, 'should one retreat from his own house, when assailed by a partner or cotenant, any more than when assailed by a stranger who is lawfully upon the premises? Whither shall he flee, and how far, and when may he be permitted to return?' "

This language was quoted with approval in *Jackson v. State,* 31 Md. App. at 523-24. *See* 18 Pa. Cons. Stat. Ann. § 505 (b)(2)(ii) (A) (Purdon 1973) discussed in *Commonwealth v. Eberle,* 379 A. 2d 90, 92-95 (Pa. 1977). *See also Bryant v. State,* 39 So. 2d 657 (Ala. 1949); *Hutcherson v. State,* 54 So. 119 (Ala.

---

12. A contrary position, appearing to be less strongly accepted by the states, holds that the parties are on common ground and, therefore, if a safe retreat is possible it must be taken. State v. Bissonnette, 76 A. 288, 290-91 (Conn. 1910); State v. Grierson, 69 A. 2d 851, 854-55 (N.H. 1949); State v. Provoid, 266 A. 2d at 311.

1910); *State v. Phillips,* 187 A. 721 (Del. Ct. Oyer & Terminer 1936); *Watkins v. State,* 197 So. 2d 312 (Fla. D. Ct. App. 1967); *People v. Lenkevich,* 229 N.W.2d 298 (Mich. 1975); *People v. McGrandy,* 156 N.W.2d 48 (Mich. Ct. App. 1968); *State v. Browning,* 221 S.E.2d 375 (N.C. Ct. App. 1976); *State v. Grantham,* 77 S.E.2d 291 (S.C. 1953); *State v. Gordon,* 122 S. E. 501 (S.C. 1924).

The principal contention of the State in this case is that the appellant was clearly the aggressor and, not being without fault, may not avail himself of the castle doctrine. Heavy reliance is placed upon the case of *United States v. Peterson,* 483 F. 2d 1222 (D.C. Cir.), *cert. denied,* 414 U. S. 1007 (1973). *Peterson,* however, is based upon unsettled principles of District of Columbia law [13] and we find it inapposite. Moreover, in *Peterson,* the appellant was a participant in an affray to such an extent that one might question the giving of a self-defense instruction in the first instance. In the case at bar, the trial court reasoned, we think correctly, that self-defense was an issue in the case. It was also apparent that a jury question existed as to whether or not appellant was the aggressor.[14] That being so, it was not the function of the trial court to decide — for castle doctrine purposes — the issue of aggression *vel non* on the part of the appellant, as the State appears to contend, but, rather, to leave that question for determination by the jury under appropriate instructions.

---

13. The court in Peterson stated:

> "Despite the practically universal acceptance of the 'castle' doctrine in American jurisdictions wherein the point has been raised, its status in the District of Columbia has never been squarely decided. But whatever the fate of the doctrine in the District law of the future, it is clear that in absolute form it was inapplicable here."

483 F. 2d 1222, 1237 (D.C. Cir.), *cert. denied,* 414 U. S. 1007 (1973).

14. This case does not involve excusable or imperfect self-defense and, therefore, we do not decide the effect or application of the castle doctrine to a factual situation presenting such an issue. *See generally* Whitehead v. State, 9 Md. App. 7, 262 A. 2d 316 (1970); Tipton v. State, 1 Md. App. 556, 232 A. 2d 289 (1967); Clark & Marshall, *supra* note 3, at § 7.03; Perkins, *supra* note 3, at 903-907; Wharton's *Criminal Law and Procedure, supra* note 4, at §§ 213, 227-229, 232.

Such instructions should, in our judgment, properly include a caveat, in appropriate language, that the castle doctrine is for defensive and not offensive purposes and does not confer a license to kill or to inflict grievous bodily harm merely because the assault takes place within the defendant's home; rather, that it is subject always to the primary prerequisites of self-defense, including particularly the requirements that the person assailed not be the aggressor, that the apprehension of personal harm be reasonable and that no more force than necessary be applied.[15]

. In sum, it is our conclusion in the instant appeal that when the trial court undertook to instruct the jury on the subject of self-defense, it was incumbent upon the court to provide an accurate and complete statement of the law.[16] Its failure to grant an instruction under the castle doctrine was a significant and serious omission. This, as we have previously indicated, was error. Other courts, including the Supreme Court, have similarly held it to be reversible and prejudicial error to give a standard self-defense instruction without the castle doctrine exception when the evidence supports its applicability. *See Beard v. United States,* 158 U. S. at 563-64 (1895); *Hedges v. State,* 172 So. 2d at 826-27; *Watkins v. State,* 197 So. 2d at 313; *People v. Lenkevich,* 229 N.W.2d at 300-02; *People v. McGrandy,* 156 N.W.2d at 49-50; *State v. Grantham,* 77 S.E.2d at 293; *State v. Bowers,* 115 S. E. 303, 305 (S.C. 1923); *State v. Marlowe,* 112 S. E. 921, 922 (S.C. 1922); *State v. Gibbs,* 102 S. E. 333, 334 (S.C. 1920); *State v. Brooks,* 60 S. E. 518, 519-20 (S.C. 1908); *State v. Preece,* 179 S. E. 524, 527-28 (W. Va. 1935).

Appellant's additional contention with respect to the alleged improper interrogation of the victim's mother need

---

15. *See generally* D. Aaronson, *Maryland Criminal Jury Instructions and Commentary* §§ 5.11-.16 (1975).

16. This, of course, differs from the situation where proposed instructions are refused, the court preferring its own general charge. So long as the instructions given advise the jury fairly and adequately and cover the points of law properly embodied in the requested instruction, there is no error. Cropper v. State, 233 Md. 384, 390, 197 A. 2d 112 (1964); King v. State, 36 Md. App. 124, 136, 373 A. 2d 292 (1977).

not be considered in the light of our finding on his first assignment of error.

*Judgment reversed; case remanded for new trial; Mayor and City Council of Baltimore to pay the costs.*