# BETTY DAVIS DAWSON *v.* STATE OF MARYLAND

[No. 1328, September Term, 1977.]

*Decided December 6, 1978.*

The cause was argued before MASON, LISS and MACDANIEL, JJ.

*Paul T. Stein* and *David E. Aaronson, Assigned Public Defenders,* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Paul*

■■■■■■■■■■■■■■■

*F. Kemp, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MASON, J., delivered the opinion of the Court.

Betty Davis Dawson, appellant, was convicted by a jury in the Circuit Court for Montgomery County of manslaughter and use of a hand gun in the commission of a crime of violence. She admits killing the victim, but contends it was in self-defense.

According to the evidence adduced at trial, on the evening of 2 June 1977 appellant and Ray Dawson, her ex-husband with whom she had resumed living, became involved in a heated argument. When Dawson indicated he was going out appellant attempted to stop him by twisting and bending the metal license plates on his car with her bare hands. Apparently angered by this, Dawson knocked appellant to the ground and drove off. After having a couple of drinks, appellant obtained a ride with Diane Aubinoe to the Summit Apartments in Rockville to look for her husband. On arriving at this apartment complex they rode around until Dawson's car was seen. Appellant and Diane got out of the car and approached two people sitting in lawn chairs drinking beer. Upon recognizing Dawson as one of the persons, appellant inquired, "what in the hell are you doing here?" to which he answered, "none of your damn business." Appellant then smacked him across the face, whereupon he retaliated by hitting her a number of times and, according to Diane, "fought her like a man." During the fight Margaret Bress, the victim, remained seated in the other lawn chair as if nothing were happening. During the melee, appellant leaped on top of Mrs. Bress and wrapped her arms around Mrs. Bress's neck. Dawson, however, pulled her off and continued striking her. Diane indicated that she did not join the fight because appellant was doing a pretty good job of defending herself, and Dawson was getting the worst of it. Eventually, Dawson walked away and Mrs. Bress went into her apartment and closed the sliding door to the patio. Appellant then banged on the door several times and yelled, "open the

door bitch." Soon thereafter, Mrs. Bress opened the patio door and apparently stood in the doorway.

According to appellant, when Mrs. Bress opened the door she had a knife in her hand. "I asked her to come out, I would like to talk to her" and she said: "No, I am not coming no damn place." Mrs. Bress swung the knife in front of her and said, "she would cut my damn guts out." She became frightened and reached in her pocket book and pulled her gun out. When Mrs. Bress stepped toward her again swinging the knife, "I touched the trigger just a little too hard, I guess, and it went off." After the shooting she put the gun in her pocketbook and walked to the parking lot where she was stopped by Mr. Papadopoulas, a tenant who lived in the apartment above the victim.

The State's version of the incident, as testified to by the victim's husband and children who were in the apartment, was that the victim did not have a knife and that she was shot immediately after opening the door. There is nothing in the record to show that the victim left her apartment prior to the shooting, or that the appellant attempted to enter it.

On appeal appellant contends (1) that the trial court erred in its instructions to the jury on the issue of self-defense; (2) that the trial court erred in denying her motion to suppress the gun seized from a pocketbook during a warrantless search; (3) that the trial court erred in denying her motion to suppress a series of statements taken while she was in custody.

## I.

## INSTRUCTIONS

The trial judge's instructions to the jury regarding self-defense were as follows:

"The defendant has raised the issue of self-defense, that is, legal justification. In order to justify the crime charged on the basis of self-defense, the defendant must have had reasonable grounds to believe, and must have, in

fact, believed herself to be in apparent, imminent or immediate danger of bodily harm from her assailant or potential assailant. The circumstances under which the defendant acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable belief that the other person was about to kill her or to do her serious bodily harm.

"You must determine whether the defendant was justified in meeting force with force. If you find such justification, the force used against another must not have been unreasonable or excessive. There must not have been used more force than the exigency reasonably demanded. One is not entitled to use any greater force that he or she has reasonable grounds to believe, and actually did believe, to be necessary under the circumstances to save her life or to avert serious bodily injury.

"If the defendant actually did believe that she was in imminent danger of death or serious bodily harm from which she could save herself only by using deadly force, and had reasonable grounds to so believe, then she had a right to employ deadly force to defend herself. Deadly force is that which is intended to or likely to cause great bodily harm or death.

"Deadly force is unreasonable if non-deadly force is sufficient to avert the threatened harm. However, deadly force may be entirely reasonable under some circumstances.

"Generally, ladies and gentlemen, the law does not require one to retreat. There used to be a concept, and still is in some jurisdictions, that you always had to retreat to the wall before you could use any self-defense or force to oppose someone else who was coming after you. That is no longer the law with respect to a person who is blameless in the first instance, who is not the aggressor or did not provoke the incident. A non-aggressor does not have to

retreat, [1] but if you are the aggressor, even with this limited intent going in, then the law says that you must retreat if there is a reasonably available area of retreat for you and if time and circumstances permit the retreat, and if you don't retreat and you use fatal force, then you may be guilty of manslaughter.

"The burden is upon the State to prove to you beyond a reasonable doubt that the defendant did not act in self-defense of this case."

Appellant did not take exception to the Court's charge, but requested additional instructions — which were denied. The narrow issue then is whether the Court committed reversible error in refusing to give appellant's requested instructions:

"MR. AARONSON: First, Your Honor, with respect to retreat: We request that the jury be instructed that if you find the defendant was the aggressor and that there is a duty to retreat, the retreat is a subjective concept and the test is: Subjectively in the circumstances of the moment did she have an obviously safe retreat. It's not the question of whether a reasonable person looking back with hind sight would have retreated, but whether the defendant in the circumstances of the moment had an obviously safe retreat.

"Secondly, Your Honor, we request that page ten of the defendant's instructions be given regarding if they find that the defendant is the original aggressor, and we request the jury be told the following:

'You are instructed that where one attacks another in a manner not contemplated to kill or

---

**1.** Because we are not concerned here with the duty of a non-aggressor to retreat, we need not determine whether the court's instructions on this issue were a correct statement of the Maryland law. See the following cases which discuss the retreat rule: *Bruce v. State,* 218 Md. 87 (1958); *Bennett v. State,* 230 Md. 562 (1962); *Crawford v. State,* 231 Md. 354 (1963); *DeVaughn v. State,* 232 Md. 447 (1963); *Whitehead v. State,* 9 Md. App. 7 (1970); *Thomas v. State,* 9 Md. App. 94 (1970); *Gainer v. State,* 40 Md. App. 382, 391 A. 2d 856 (1978).

to do serious bodily harm, and the other counter-attacks using excessive and unreasonable force in a manner reasonably contemplated to cause death or great bodily harm, then the original attacker becomes the defender. If there is no obviously safe place of safety available, the defendant may then use whatever force necessary to repeal the counter-attack of the original defender.' "

Appellant's right to the proposed instructions is premised on the theory that even if she were the initial aggressor using non-deadly force she became the defender when the victim counter-attacked with deadly force, *i.e.,* a knife. As support for this theory she relies on *Tipton v. State,* 1 Md. App. 556 (1967). In that case the father of an armless boy, who was the apparent aggressor in an affray, shot and killed the assailant who was about to strike his son on the head with a rock. In reversing the conviction this Court stated:

"We think reason and logic would support the proposition that where one attacks another in a manner not calculated to kill or to do serious bodily harm, and the defender counterattacks, using excessive and unreasonable force in a manner reasonably calculated to cause death or great bodily harm, then the original attacker becomes the defender. If the original assailant is unable to retreat to a place of safety or there is no place of safety available, then he may use whatever force necessary to repel the counterattack of the original defender." *Id.* at 562.

The law regarding the duty of an aggressor to retreat is explicitly set forth in R. M. Perkins, *Criminal Law,* § 4.1, 1005-06 (2 ed. 1969):

"One suggestion has been that liberty itself is threatened if a law-abiding citizen can be forced from a place where he has a right to be.[2] This

---

2. See Footnote 1.

extreme privilege is not granted to an 'aggressor'. One who started the encounter with an unlawful attack, or who culpably engaged in an unlawful exchange of blows, enjoys no such position. He is in no sense blameless. But if he started, or joined in, his fault in doing so is entirely overshadowed if the other wilfully changes it to a deadly encounter. Hence he has not entirely forfeited his privilege of self-defense. *If he kills without availing himself of an obviously safe retreat he is guilty of manslaughter.* If he retreats as far as he can in reasonable safety, he may use deadly force if this reasonably seems necessary to save himself from death or great bodily harm. And if by reason of the suddenness and fierceness of the change in the nature of the contest there is no reasonable opportunity to retreat, he may resort to deadly force where he is. Where both parties are in the wrong, neither is privileged to use deadly force without retreating." (emphasis added).

Although the undisputed evidence shows that appellant was the initial aggressor, there is nothing in the record to indicate that she attempted or even contemplated retreating before firing the fatal shot, even though there was obviously a plain avenue of escape. Accordingly, in the absence of some evidence showing an inability to retreat, or that there was no safe place to retreat, the requested instructions were more than appellant was entitled.

*Cf. Street v. State,* 26 Md. App. 336, 339 (1975) where in a felony murder case we said:

"The only evidence of self-defense in the instant case is the appellant's self-serving declaration to Roberts, that he shot the man 'because the man had pulled out some scissors on him.' Surely, this meager shred of evidence was too slight and doubtful in this factual situation to raise the issue of self-defense for jury consideration. * * * If the appellant had requested an instruction on self-defense, which he

did not, it would have been properly refused because it was not 'supported by the evidence.' If the instruction were granted, it would have been more than the appellant was entitled to." (Citations omitted).

In summary, we conclude that the instructions, as given, more than fairly and adequately covered the essential points of law supported by the evidence in the case, and that the trial judge did not err in refusing to grant appellant's proposed instructions.

## II.

## THE SEARCH

In the present case Officer Graham received a call over his police radio that there was a shooting in an apartment complex known as Summit Hills. The testimony of the officer on direct examination regarding his encounter with appellant and the search of her pocketbook is as follows:

"Q. After your initial observation then what did you do next?

"A. I observed that they were in a struggle; it appeared that the white male was trying to get the pocketbook away from the white female.

"I didn't know if this was related to the shooting or not, but I figured it might be, and since the first call for the shooting was a family fight, secondly it came up as a shooting, so I stopped the two individuals as they crossed the parking lot, and had them sort of backed up against a car.

"At that time I said: 'What's going on here?' The white female indicated to me that she was the one that did it, she is the one that did it, it's in the purse.

"Q. Did you have any further inquiries at that point, or what did you do?

"A. I said: 'What happened?' and he said: 'She shot a girl.' At that time, the white female said: 'I didn't hurt anybody.'

"Q. The defendant you mean?

"A. That's correct.

"At that time the white male again: 'It's in the purse.' I said to the white female: 'Give me your purse,' and at the same time I took the purse from her.

"At that time she said to me: 'Yes, I shot her and the gun is in the purse.'

"Q. After you took the purse, what did you do with it?

"A. I opened it.

"Q. And what did you observe within that purse?

"A. I observed laying in the middle of the purse a handgun, a small caliber handgun." (T. 254-255).

In her motion to suppress, appellant relied on the case of *United States v. Chadwick,* 433 U. S. 1 (1977), as the basis for excluding the gun. The State, on the other hand, relied on the theory of "stop and frisk" as justification for admitting the gun. In denying the motion the trial court stated:

"THE COURT: Now, during the course of proceedings yesterday the defendant presented to the Court evidence to support a motion to suppress a confession which was allegedly given to the Montgomery County Police on the night of this homicide, and also to suppress seizure of certain evidence, to wit: a handgun which was found in the defendant's purse.

"The defendant relies upon *Chadwick v. The United States* [sic] urging the privacy concept, as held there applying to a foot locker, should apply to the defendant's purse. It is a close question, and it is a novel question, and one which undoubtedly would be the subject of a very interesting appeal, but I will rely upon *Terry v. Ohio,* and *Adams v. Williams* and conclude that the officer, given the totality of the circumstances, acted properly.

"This crime occurred on the second of June, and the opinion of Justice Burger was not issued until the 21st of June, so probably the officer hadn't had a chance to read Law Week and find that he was not acting properly, if, in fact, he was not acting properly." [3]

Under the facts of this case we think the officer's search of appellant's pocketbook was constitutionally permissible whether done pursuant to a "stop and frisk" as urged by the State, or as an incident to a lawful arrest as urged by appellant.

In *Chadwick* federal narcotics agents received reliable information that the defendants were transporting marihuana by train in a footlocker from San Diego to Boston. When the train arrived in Boston, Federal agents were on hand, accompanied by a police dog trained to detect marihuana. As the defendants claimed their luggage, including a 200 pound footlocker, the dog signaled the presence of a controlled dangerous substance inside the footlocker. After the defendants placed the footlocker in the trunk of their car, they were arrested and taken to the Federal Building. One and a half hours after the arrests the agents, without a warrant or consent of the defendants, opened the footlocker and found a large quantity of marihuana. The Court held that the search was illegal and excluded the admissibility of the marihuana into evidence. In reaching its decision the Court, in clarifying when a warrant is required to search property seized at the time of an arrest, stated:

"When a custodial arrest is made, there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed. To safeguard himself and others, and to prevent the loss of evidence, it has been held

---

3. We do not consider the question of the retroactivity of *Chadwick* because it was neither raised here nor below. *See Shingleton v. State of Maryland,* 39 Md. App. 527 (1978), footnote 6, where we said *Chadwick* may be viewed retroactively. *But see United States v. Reda,* 563 F. 2d 510 (1977) where the court held that *Chadwick* is not to be applied retroactively.

reasonable for the arresting officer to conduct a prompt, warrantless 'search of the arrestee's person and the area "within his immediate control" — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' *Chimel v. California,* 395 U. S., at 763. *See also Terry v. Ohio,* 392 U. S. 1 (1968).

\* \* \*

"However, warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' *Preston v. United States,* 376 U. S. at 367, or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." *United States v. Chadwick,* 433 U. S. at 14-15.

Appellant argues, in essence, that the search of her pocketbook, after it was seized and in control of Officer Graham, went beyond the limits now permissible under *Chadwick* as a search incident to a lawful arrest.

Prior to *Chadwick* we would have had no difficulty in holding that the police could conduct a warrantless search of an arrestee's pocketbook as an incident to a lawful arrest under the principle enunciated in *Chimel v. California,* 395 U. S. 752 (1969). In that case the Court held that as an incident to a lawful arrest officers may search both the arrestee and the area within the arrestee's control for weapons or destructible evidence. Numerous pre-*Chadwick* cases in federal and state jurisdictions have upheld searches of pocketbooks taken from arrestees or areas within their immediate control.

The following cases have upheld searches of pocketbooks: *United States v. Jeffers,* 520 F. 2d 1256 (7th Cir., 1975); *United States v. Johnson,* 495 F. 2d 378 (4th Cir., 1974); *United States v. Berryhill,* 445 F. 2d 1189 (9th Cir., 1971); *Godwin v. State,* 133 Ga. App. 397, 211 S.E.2d 7 (1974); *State v. Williams,* 522 P. 2d 1213 (Or. Ct. App. 1974); *State v. Perry,* 499 S.W.2d 473 (Mo. Sup. Ct. 1973).

The continued precedential value of these cases, however, must be re-examined in light of *Chadwick.* In *Shingleton v. State,* 39 Md. App. 527 (1978) the state police stopped a van in which they had probable cause to believe the occupants were in possession of narcotics. After the occupants were removed from the van and arrested, the police conducted a warrantless search of a briefcase found in the van. This court in holding that the search was illegal under *Chadwick* said: "The law is now clear that the police, having gained 'exclusive control' of the briefcase and eliminated by space and time any possibility of the arrestee's 'gain[ing] access to the property to seize a weapon or destroy evidence,' may not then conduct a warrantless search of that property under a guise of a search incident to the arrest." *Id.* at 543. In *United States v. Berry,* 560 F. 2d 861 (7th Cir., 1977) federal agents took an attache case from a suspected bank robber at the time of his arrest. Approximately 8 minutes after the suspect was arrested, searched and handcuffed, the agent in charge searched the attache case. The Court, in an instructive and persuasive analysis of *Chadwick* stated:

> "The Court appears to be distinguishing — for purposes of whether a warrant is required to search property in police custody that was seized from a suspect at the time of the arrest — between searches of an arrestee's clothing, as in *Edwards,* or items that were in his pockets, as in *Robinson,* from searches of other possessions, such as luggage, that were within his immediate control. Warrantless searches of the former items after they come in police custody can be characterized as searches of the arrestee's person because they do not involve any greater reduction in the arrestee's expectations

of privacy than that caused by the arrest itself. Warrantless searches of the latter items, however, affect privacy interests other than those reduced by the arrest itself and thus can be conducted only so long as the danger exists that the arrestee might gain access to the property to seize a weapon or destroy evidence.

\* \* \*

"[W]e believe that the search of the attache case is better characterized as a search of possessions within the arrestee's immediate control than as a search of his person. First, as a matter of common usage, a briefcase is not an item carried on an individual's person in the sense that his clothing or items found in his pocket are. Second, as was true of the footlocker in *Chadwick,* the privacy interest in the attache case here centered on its contents rather than on the container itself. A search of the interior constituted 'a far greater intrusion into Fourth Amendment values' than either Wilson's arrest or the impoundment of the case. Finally, *unlike a purse that might be characterized as 'immediately associated with the person of the arrestee* because it is carried with the person at all times, the attache case here was more like luggage in that Wilson was not carrying it when he left the building, but rather removed it from an auto trunk immediately before his arrest. The warrantless search of the attache case in police custody thus cannot be justified as a search of Wilson's person." (emphasis supplied). 560 F. 2d at 864.

Of like import *see United States v. Ester,* 442 F. Supp. 736 (S.D. N.Y. 1977); and *State v. Dudley,* 561 S.W.2d 403 (1978), where searches of suitcases were held invalid. *See also State v. Dean,* 574 P. 2d 572 (1978) where a search of an overnight case was held invalid. *Cf. United States v. Moreno,* 569 F. 2d 1044, (9th Cir., 1978) where the Court, without mentioning *Chadwick,* but in reliance on *Chimel* held: "The search of Mrs.

Moreno's purse was a valid search incident to her arrest, and a warrant was, therefore, unnecessary." 569 F. 2d at 1052.

Returning to the instant case, we think appellant's pocketbook, unlike the footlocker in *Chadwick,* the suitcases in *Ester* and *Dudley,* the overnight case in *Dean* and the briefcase in *Shingleton,* was "immediately associated with the person of the arrestee." Therefore, under the rationale of *Berry* which we adopt, the search was permissible under *Chadwick* as a search of appellant's person. Such a search, we believe, is analytically akin to a search of items found in an arrestee's clothing or pockets.

Even if we were to construe appellant's purse as property not "immediately associated with the person," but property "within appellant's immediate control," the search of the purse would still be permissible under *Chadwick* because of exigent circumstances. Here, the officer, in responding to a report of a shooting, observed a man and a woman apparently struggling over a pocketbook. Upon being informed that appellant had done the shooting and had a gun in her purse, the officer grabbed the purse from under appellant's arm. Although at this point the officer may have had custody of the purse, he was only one or two feet from appellant and still involved in an uncontrolled and potentially life endangering situation. Appellant was neither handcuffed nor under any physical restraints. She was within the *Chimel* perimeter of reachability, lungeability or graspability, *i.e.,* the area from within which she could gain access to the pocketbook and the gun; thus, the search was permissible.

The appellant further argues that the search of her pocketbook was not, as held by the trial court and urged by the State, a justifiable "stop and frisk" within the ambit of *Terry v. Ohio,* 392 U. S. 1 (1968). In *Terry* the Supreme Court recognized the concept of "stop and frisk" and squarely held that a police officer could, under appropriate circumstances, "stop and frisk" persons thought to be carrying concealed weapons even though there is less than probable cause for an arrest. Assuming *arguendo,* that Officer Graham lacked probable cause to arrest the appellant at the time he seized and searched her pocketbook for a weapon, the record clearly

shows that he had specific and articulable facts upon which to reasonably believe appellant was armed and dangerous.

Appellant next contends that the search exceeded the scope of a justifiable frisk. She argues, "that at no time did Officer Graham perform a pat down or frisk of defendant's person or attempt to squeeze the outside of the pocketbook to see if it contained a hard object such as a gun...." We do not think *Terry* is so restrictive in its application that it would preclude the officer in this case from searching appellant's pocketbook for a gun. In *Terry,* the Supreme Court did not attempt to place such a limit on the scope of this type of protective search for weapons. It stated:

> "We need not develop at length in this case, however, the limitations which the Fourth Amendment places upon a protective seizure and search for weapons. These limitations will have to be developed in the concrete factual circumstances of individual cases. * * * The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." 392 U. S. at 29.

In *Adams v. Williams,* 407 U. S. 143 (1972) an informant told a police officer that an individual seated in a nearby vehicle was carrying a gun in his waistband. Acting on this information, the officer approached the car and asked the occupant to open the door. When the occupant rolled down the window instead, the officer reached into the car and removed a fully loaded revolver from the individual's waistband. The gun there, as in this case, was not visible to the officer, but it was in precisely the place indicated by the informant. A divided Court upheld this search on the basis of *Terry.* See *United States v. Simmons,* 567 F. 2d 314 (7th Cir. 1977) where the Court, in reliance on *Terry,* upheld the search of a purse for a gun that was within the immediate control

of the arrestee's female companion, who was not placed under arrest. The Court held:

> "Where, however, an arresting officer by his own calculation which must survive objective review, determines that a dangerous situation may exist under the circumstances due to the presence of a third party, we do not propose, out of regard for the safety of the officers, to limit the search to a 'pat down' when the actual danger is seen reasonably to exist in easy access to items within the companion's immediate control." *Id.,* at 319.

*See also United States v. Poms,* 484 F. 2d 919 (4th Cir. 1973) where the Court upheld the search of a shoulder bag under the guidelines established by *Terry* for protective searches.

For the reasons herein stated, we conclude that the search of appellant's pocketbook by Officer Graham was permissible under *Chadwick* as a search incident to a lawful arrest or, as a valid "stop and frisk" under *Terry.*

## III.
## STATEMENTS

Finally, appellant argues that a series of statements she made to the police before being advised of her rights under *Miranda v. Arizona,* 384 U. S. 436 (1966), were improperly admitted into evidence. We disagree.

As previously indicated, when Officer Graham initially encountered appellant and Mr. Papadopoulas, he inquired, "what happened? and Mr. Papadopoulas replied, "she shot a girl," . . . "it's in the purse." After this remark appellant said, "I didn't hurt anybody." But upon the seizure of her purse by Officer Graham she remarked, "yes, I shot her and the gun is in the purse."

The record further indicates that while being transported to the police station appellant admitted shooting the victim, although repeatedly told by Officer Graham not to say anything about the crime. Upon arrival at the police station,

appellant was informed that a nitric acid test was going to be administered to her hands to determine if she had recently fired a gun. Appellant told the officer he "didn't need to do the test because she did shoot a gun and she was an honest person."

Appellant contends these statements were inadmissible because they were the product of custodial interrogations before she had been advised of her *Miranda* rights. Even if we assume·appellant was in police custody when she said, "I didn't hurt anybody" and, "yes, I shot her and the gun is in my purse," these statements were not made in response to police interrogation. They were volunteered statements or blurts which are outside the protective orbit of *Miranda.* See *Cummings v. State,* 27 Md. App. 361, 381-385 (1975) and the cases cited therein.

In *Tisdale v. State,* 30 Md. App. 334 (1976), a police officer observed a taxidriver holding the defendant at bay. The officer inquired, "what was going on" to which the taxidriver replied, "this guy just robbed me." The defendant then said, "Yes, I robbed him, but you all don't understand." This Court held: ". . . there was no custodial interrogation here, and appellant's statement, if made and however made, was clearly a spontaneous utterance, admissible as such. *Miranda* would not have been applicable even if appellant had been in custody." Regarding the inculpatory statements made by appellant enroute to the police station and prior to the administration of the nitric acid test, we think they were also volunteered statements or blurts, and not, as urged by appellant, statements extracted by subtle questioning intended to elicit incriminating responses.

After the nitric acid test had been completed, appellant was advised for the first time of her *Miranda* rights. She then gave an inculpatory statement which was reduced to writing and signed. The detective who gave appellant her *Miranda* rights read them from a standard form used by the Montgomery County Police Department. He described the procedure in the following colloquy:

Q. Starting at the top and working your way to the bottom, would you indicate what the written

notations are and what they signify and why you placed them on there.

A. Yes, sir. The first four are check marks indicating that I read a statement to Mrs. Dawson.

Q. For the record, what were the statements that you read that you have checked off?

A. 1. You have a right to remain silent.

2. Any statement you make may be used as evidence against you.

3. You have a right to the presence of a lawyer prior to and during any questioning and if you cannot afford a lawyer one will be appointed for you if you desire.

4. Anytime during any questioning you may remain silent or ask for a lawyer.

A. At Number 5 is where she started responses to my questions.

Q. What are the questions and what are the answers that come after that?

5. Do you understand what I have said? and she answered, "I sure do."

6. Do you have any questions about what I have said?" and she responded, "No, sir. I don't."

7. Do you want to answer my questions? and she responded "I will."

8. Do you want a lawyer here and now? and she responded "I'll take one later" . . . .

Appellant contends that her answer "I'll take one later" to Question 8 *supra* was not a full waiver of her right to counsel. As we view it, appellant's response, in the context of her answers to the other *Miranda* questions, was a knowing and intelligent waiver of her right to counsel. Her answer clearly demonstrated a willingness to talk to the police at that particular time. There was no equivocation on her part.

Based upon our independent, reflective, constitutional judgment, we conclude that all of appellant's statements were

voluntarily given and properly admitted into evidence against her. See *Walker v. State,* 12 Md. App. 684 (1971).

*Judgments affirmed.*
*Costs to be paid by appellant.*