UNITED STATES of America,
Plaintiff-Appellee,

v.

Brunilda GARCIA, Defendant-Appellant.

No. 78–1671.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1978.

Decided Aug. 31, 1979.

Carol A. Brook, Federal Defender Program, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Ann C. Williams, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, SPRECHER and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Defendant-appellant Brunilda Garcia appeals from the order of the district court denying her motion to suppress certain evidence seized incident to her arrest, and from the judgment entered upon her subsequent conviction for possessing, with intent to distribute, a controlled substance in violation of the federal narcotics laws. The solitary issue on appeal is whether the warrantless search conducted incident to her arrest unconstitutionally infringed the rights guaranteed to the defendant by the Fourth Amendment. We are unpersuaded by the arguments advanced in support of this contention, and hold that a warrantless search of the contents of hand-carried luggage, seized incident to and inspected contemporaneous with a lawful custodial arrest does not constitute an impermissible invasion of privacy in contravention of the Fourth Amendment. Accordingly, we regard the search challenged here to be reasonable within the meaning of the Fourth Amendment, and therefore affirm the judgment appealed from for the reasons set forth below.

I

On September 28, 1977, a federal grand jury returned a one count indictment against defendants Brunilda Garcia and Saul Valentin, charging each of them with the possession and intent to distribute 2,405 grams of heroin, in violation of Title 21, United States Code, Section 841(a)(1).

Prior to trial, Garcia moved to suppress the heroin on the grounds that it had been seized during an unlawful, warrantless search of the contents of her luggage. Following a plenary hearing, the district court denied the motion to suppress, and the defendant's subsequent motion to reconsider was also denied. On April 11, 1978, at the conclusion of a bench trial, the court found Garcia guilty as charged in the indictment.[1] On May 16, 1978, the court sentenced Garcia to the custody of the Attorney General for two years, to be followed by a three year term of mandatory special parole. The court also denied defendant's motion for a new trial. Garcia then appealed to this court, contending that the district court erred in denying her motion to suppress.

The facts adduced at the suppression hearing, assessed in the light most favorable to the Government,[2] showed that on June 28, 1977, Task Force Agent James Foster, a Chicago Police Officer assigned to the Drug Enforcement Administration in Chicago, received a telephone call from an informant, who requested a meeting concerning narcotics transactions. The informant had been associated with the Chicago Police Department since 1972 or 1973, and had previously provided reliable information on at least six occasions which led to arrests.

Later that morning, Agent Foster, accompanied by Chicago Task Force Agent Nyman, met with the informant, who apprised them that a couple residing in Chicago were traveling on a weekly basis to Los Angeles and returning to Chicago with four to six kilos of heroin in their possession. The informant identified the two individuals to the agents as a woman named Bruna and a man named Saul Balentin or Valentin. Agent Foster knew of Saul Valentin through the Narcotics Section of the Chicago Police Department because of Valentin's prior arrest for a narcotics violation. The informant also provided the agents with a description and the residence address of the couple. An investigation conducted that afternoon confirmed that defendant Garcia resided at the address provided by the informant.

Early that evening, Agents Foster and Nyman again met with the informant, who identified Valentin from a Chicago Police Department photograph as the man he had earlier described and had seen at the Chicago address. The informer also stated that Brunilda Garcia could be the woman he knew only as Bruna. Furthermore, the informant indicated that Bruna and Valentin always traveled to Los Angeles from O'Hare International Airport via American Airlines and returned to Chicago within a few days. The informant also stated his belief that Bruna and Valentin were in Los Angeles and were possibly en route to Chicago on an American Airlines flight arriving at O'Hare Airport.

On June 29, 1977, Agent Foster received information from the O'Hare Airport Police authorities that a Mr. and Mrs. S. Valentin had purchased two round-trip airline tickets to Los Angeles on June 29, with an open return date, and had already departed from O'Hare Airport for Los Angeles on American Airlines Flight 115.

Two days later, on July 1, 1977, Agent Foster was informed by the O'Hare Police Detail that a Mr. and Mrs. S. Valentin had executed the return tickets on American Airlines Flight 184, scheduled to arrive that afternoon at 3:40 p.m. in Chicago. The assigned arrival gate was then placed under surveillance, and the agents observed the passengers from American Airlines Flight 184 deplane from the aircraft exit door. As the suspected couple disembarked, Agent Foster identified Garcia and Valentin as the individuals matching the descriptions given by the informant, and further confirmed the identity of Valentin from the Chicago Police Department photograph.

1. The district court granted defendant Valentin's motion for acquittal at the close of the government's case.

2. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Alewelt,* 532 F.2d 1165 (7th Cir. 1976).

The suspects were followed through the concourse to the baggage area on the lower level, where Valentin was seen handing Garcia small pieces of multi-colored paper which appeared to be baggage claim tickets. After pointing Garcia in the direction of the baggage retrieval area, Valentin exited the terminal building where he was detained by several agents. Upon questioning by the agents, Valentin claimed he had just arrived at O'Hare in a taxi cab to meet a friend. Valentin was then arrested and placed in a police vehicle parked outside the airport entrance.

■ The fact of the arrest was conveyed to the agents maintaining surveillance on Garcia at the baggage claim area inside the airport terminal. Garcia then picked up two suitcases, one in each hand, and proceeded to exit the terminal through the automatic glass doors. Agent Foster, who was positioned in front of the glass doors outside the terminal, observed Garcia approach him, carrying one plaid suitcase and one brown vinyl suitcase, as well as her coat and a shoulder bag. The defendant was accompanied by a group of people including three other agents. As she stepped through the doorway, Agent Foster approached her, displayed his police identification, and requested her to stop in order to ask her some questions. Garcia immediately dropped both suitcases and became hysterical, exclaiming "I knew I shouldn't have done this," and proceeded to urinate on her clothing.

Agent Foster placed Garcia under arrest, and escorted her out of the flow of pedestrian traffic to a location four feet from the doorway. The agent then removed the leather jacket the defendant had draped over her shoulder bag and wrapped the jacket around the defendant in an apron-like fashion to conceal her soiled clothing. The defendant was not handcuffed or otherwise restrained during this time. Agent Nyman seized the two closed suitcases from the spot where the defendant had dropped them, and brought them to within one foot of her new position. Agent Foster opened the suitcases, which were zippered shut but not secured by a lock, and proceeded to search their contents. One of the suitcases contained nine plastic bags filled with a brown powdery substance which a field test determined to be heroin. The agents testified that the time period between the moment the defendant was approached, placed under arrest, and her luggage seized and searched, did not exceed fifteen seconds.

On appeal, the defendant contends that the warrantless search of the contents of her luggage violated her rights secured by the Fourth Amendment, and that the district court accordingly erred in denying her motion to suppress the heroin seized as a result of that search. We disagree. Nor do we agree with defendant's contention that the result obtained in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), or its underlying rationale, is dispositive of this appeal.

## II

■ It is fundamental that the Fourth Amendment secures to individuals a comprehensive right of privacy against unwarranted invasions by the state. *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). But not every intrusion is protected by constitutional proscriptions; the penumbra of the Fourth Amendment extends only to such searches and seizures as are unreasonable. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Thus, the prevailing rule that warrantless searches and seizures are *per se* unreasonable is subject to a few, well-delineated exceptions, cognitive of the balance which must be struck between the competing interests of the individual's right of privacy and the societal objective of effective criminal justice administration. *See, e. g., Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ Accordingly, it is well-settled that a warrantless search conducted incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. *United States v. Robinson*, 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Such searches have been held to

be reasonable within the meaning of the Fourth Amendment when effected for the purpose of disarming the arrestee or to preserve evidence probative of criminal conduct. For example, it has been held that a warrantless search may be undertaken pursuant to a valid arrest if it is substantially contemporaneous with the arrest and is confined to the person and immediate vicinity of the arrestee. *See, e. g., Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *Shipley v. California,* 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969).

■ The search incident to arrest exception embraces warrantless searches of both the arrestee's person [3] and the area within the arrestee's immediate control.[4] This teaching was articulated in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), in which the Court outlined the legitimate scope of such searches, stating at 763, 89 S.Ct. at 2040:

"[I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from which he might gain possession of a weapon or destructible evidence."

■ Thus, the standard emergent from a review of the seminal cases defining the scope of warrantless searches incident to arrest is that, to be found reasonable and therefore exempt from the warrant requirement, the search must be conducted substantially contemporaneous with the arrest and be spatially limited to the person of the arrestee, the possessions immediately associated with the person of the arrestee, and the area within the arrestee's immediate control.

Application of these principles to the instant case compels the conclusion that the search in question was reasonable under the strictures of the Fourth Amendment. We do not consider the teachings of *Chadwick* to mandate a different result. Despite a superficial similarity between the factual settings (*i.e.,* a search of the contents of luggage), substantial differences become apparent upon an objective examination of the facts controlling *Chadwick* and those governing the present case. These differences so distinguish *Chadwick* as to render its application inapposite to the factual circumstances presented by this appeal, and *a fortiori* dictates that *Chadwick*'s legal rationale does not control the resolution of this case. On the contrary, in the context of the facts governing this appeal, the defendant's reliance on *Chadwick* is inconsistent with a principled application of the doctrine of searches conducted incident to custodial arrests.

In *Chadwick,* the object seized was a cumbersome, two hundred pound, double-locked footlocker, which obviously could be neither quickly opened nor rapidly removed by the defendants or an accomplice at the time of arrest. It is also significant that the search itself was not undertaken in close proximity to the time and place of the arrest and seizure. Rather, the footlocker was opened more than one hour following the arrest, and then only after it had been removed along with the defendants to the police station. Moreover, since the defendants were incarcerated, the only persons present at the time of the search were police officers. Under these circumstances, ample justification existed to delay the search until a warrant could be obtained.[5]

3. *See, e. g., United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

4. *See, e. g., Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

5. The Court of Appeals in *Chadwick* simply held that:

"[T]he footlocker was beyond 'the area of control' that is searchable without a warrant incident to an arrest."
*United States v. Chadwick,* 532 F.2d 773, 781, n.6 (1st Cir. 1976). In affirming the decision of the Court of Appeals, the Supreme Court held that, under the circumstances attending the

The factual circumstances governing the search in the instant appeal are in marked contrast. The objects seized consisted of two hand-carried, portable suitcases which were quite capable of being opened quickly by the defendant in order to gain access to a weapon or evidence, or removed by a waiting accomplice of the defendant.[6] Unlike the search in *Chadwick*, the search in this case was undertaken immediately upon the defendant's arrest. The officers approached the defendant as soon as she exited the baggage terminal building, placed her under arrest, seized the luggage she carried, and undertook a search of its contents in the defendant's presence and within fifteen seconds of the announcement of the arrest. Accordingly, the search was neither remote in time or place from the arrest, and since the police had probable cause to effect the arrest and exigent circumstances were present, the warrantless search of the contents of the luggage was justified as a search incident to arrest. *See, e. g., Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

However, citing *Chadwick* as controlling authority, the defendant contends that the predicate to justify the warrantless search expired the moment the defendant was taken into custody and the luggage she carried was seized because the officers had thereby reduced the luggage to their exclusive control and the defendant's association with the property had been eliminated. But as the Supreme Court noted in *Chadwick*:

"[W]arrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest *either if* the 'search is remote in time or place from the arrest,' *Preston v. United States*, 376 U.S., at 367, 84 S.Ct. 881, *or* no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, *and* there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest."

433 U.S. at 15, 97 S.Ct. at 2485 (footnote omitted) (emphasis added).

In the context of the present appeal, Garcia claims that the luggage had, upon seizure, come within the exclusive control of the police before the search was undertaken, and that there were no exigent circumstances at the time of the search. For these reasons, the defendant contends that the search was not justified as incident to

---

warrantless search in that case, there was no danger that the defendant might have gained access to the footlocker to seize a weapon or destroy evidence. *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The Court also noted that other justifications for a warrantless search of an arrestee's luggage at the time of arrest may exist:

"[F]or example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon. *See, e. g., United States v. Johnson*, 467 F.2d 630, 639 (CA 2 1972)."

*Chadwick, supra* at 15, n.9, 97 S.Ct. at 2485 n.9.

*See also, Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). In *Chambers*, the petitioner challenged the warrantless search of the automobile in which he was a passenger because the search was conducted at the police station after he was arrested and taken into custody. Relying on its decision in *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), the Court found

that the delay in searching the automobile could not justify the search as incident to the arrest.

"Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest."

*Preston, supra* at 367, 84 S.Ct. at 883, quoted in *Chambers, supra* 399 U.S. at 47, 90 S.Ct. 1975. But notwithstanding the delay, the Court in *Chambers* held that since probable cause to arrest existed, there was probable cause to search the automobile without a warrant because of its inherent mobility, *Chambers, supra* at 50, 90 S.Ct. 1975.

*See also, United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974) (search of arrestee's clothing hours after his arrest proper as incidenta thereto).

6. The fact that co-defendant Valentin was in custody prior to the defendant's arrest does not preclude the possibility that another confederate may have been in the area.

the arrest. Further, the defendant asserts that the warrantless search is not defensible on the grounds of a reduced expectation of privacy arising out of the arrest itself. We disagree with these contentions.

First, under the circumstances in this case, an expectation of privacy by the defendant is not "one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).[7] Certainly, the arrest of the defendant, standing alone, did not *destroy* whatever privacy interests she had in the contents of the suitcases. It did, however, at least for a reasonable time and to a reasonable extent, subsume those interests into the legitimate governmental interest in discovering weapons, obstructing access to means of escape, and preventing the destruction or secretion of evidence. *See, e. g., United States v. Edwards*, 415 U.S. 800, 808–809, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

Second, to construe the term "exclusive control" as meaning it attaches immediately upon the seizure of an object located on the person or within the immediate vicinity of the arrestee, is a construction incapable of application consistent with fundamental principles of constitutional law. Under such a construction, for example, the warrantless search of an arrestee resulting in the seizure of a wallet, purse, or shoulder bag would prohibit an immediate search of the contents of that type of container, and this is plainly contrary to the law governing searches incident to arrest.[8] Rather, the concept of "exclusive control" must be construed in the context of its application in *Chadwick*, where the Supreme Court stated:

"Here the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency."

433 U.S. at 15, 97 S.Ct. at 2485–2486. The circumstances surrounding the seizure of the luggage in the present case cannot be regarded as having come under the "exclu-

---

7. *See also Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), in which the Court further delineated the "legitimate expectation of privacy" standard:

"[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate'. His presence, in the words of [*Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)], is 'wrongful'; his expectation is not 'one that society is prepared to recognize as "reasonable."' *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)."

*Rakas v. Illinois, supra*, 439 U.S. at 143, n.12, 99 S.Ct. at 430, n.12.

In the instant case, the district court observed that by entering certain public facilities, such as federal court buildings or airport terminals, persons and their immediate possessions are subject to a reduced expectation of privacy. In this connection, the court concluded that the defendant entertained a reduced expectation of privacy, reasoning that every person at O'Hare Airport was required to submit to a search of his or her luggage before admission into the gate section of the building, and that the luggage of every traveler was searched as well.

*See also, United States v. DeAngelo*, 584 F.2d 46 (4th Cir. 1978), *cert. denied,* ——— U.S. ———, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979) (defendant not permitted to avoid having his carry-on luggage searched by electing not to board his flight after x-ray screen revealed suspicious package.)

8. *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974) (search of arrestee's clothing); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (search of cigarette package); *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (search of zipper bag); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973) (search of cigarette box); *United States v. Simpson*, 453 F.2d 1028 (10th Cir. 1972), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2504, 33 L.Ed.2d 337 (1972) (search of wallet); *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (search of fingernails).

Indeed, in the instant case, the appellant does not challenge the warrantless search of the shoulder bag she carried, although it was searched at the O'Hare Airport Police Facility long after she had been arrested and taken into custody.

sive dominion of police authority," as that phrase is defined in *Chadwick*.[9]

▮▮▮▮ Third, the defendant argues that, although probable cause to arrest existed in this case, no exigent circumstances were present to exempt the search from the warrant requirement.[10] On the contrary, exigent circumstances did attend the arrest in this case. The police officers had probable cause to believe that an offense was being committed and that the defendant was in possession of evidence of the crime at the time of arrest.[11] The Fourth Amendment standard of reasonableness does not rise or fall on the detached observations of the prosecutors or the courts as to whether an exigency existed at the time of the arrest. It must be based upon a subjective analysis of the situation confronting the arresting officer. As the Supreme Court stated in *United States v. Robinson:*

"A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."

414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973).

In the instant case, based upon the operative factual setting heretofore described, it is difficult to conclude that the search was not attended by exigent circumstances. Nor is it clear that the officers' immediate search of the luggage, having previously arrested at least one suspected confederate, was not justified in view of the large number of persons proceeding in and out of the terminal at the time of the arrest. Certainly, the fact that the arrest was effected in public, at a location highly congested by pedestrian and vehicular travel, supports the officers' judgment to undertake an immediate search of the luggage.

Alternatively, the defendant argues that if any exigency did exist, it resulted from the conduct of the police officers in moving the luggage to a location within the immediate reach of the defendant. This contention ignores the reality of the circumstances surrounding the arrest. The search was consummated within fifteen seconds of the arrest, and although the defendant was separated momentarily from her luggage when she was escorted out of the flow of pedestrian traffic, the luggage continued to remain within her immediate reach during this period. The necessary removal of the defendant and her luggage from the doorway of the airport terminal clearly constituted the exercise of sound judgment by the agents.

### III

Subsequent to the *Chadwick* decision, other courts have had occasion to consider the issue raised in this appeal, and adjudication has been less than uniform. Several courts have found warrantless searches of

---

**9.** In the case at bar, the Government contends that the luggage was reduced to the exclusive control of the agents after they left the scene of the arrest with the luggage and the defendant.

**10.** Under questioning by the Court during oral argument, the Government conceded that no exigent circumstances existed at the time of the search. *Chadwick* held that, where probable cause to arrest is present, a warrantless search of luggage seized at the time of the arrest is

justified unless the search is either remote in time or place from the arrest, or no exigency exists. 433 U.S. at 15, 97 S.Ct. 2476. Thus, even assuming no exigency attended the arrest in this case, the search was proper since it was contemporaneous with the arrest.

**11.** *See, e. g., United States v. Watson,* 423 U.S. 411, 435, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (Marshall, J., dissenting).

personal luggage to be reasonable within the meaning of the Fourth Amendment.[12] The defendant, however, relies on the decision in *United States v. Schleis*, 582 F.2d 1166 (8th Cir. 1978) as support for her contention that *Chadwick* is determinative of this appeal. But unlike the case before us, the factual settings in *Schleis* and *Chadwick* are indistinguishable. In *Schleis*, for example, the defendant's locked briefcase was seized at the scene of the arrest and then taken along with him to the police station, where it was forcibly opened and contraband was discovered. On remand from the Supreme Court in light of *Chadwick*, the Eighth Circuit, sitting *en banc*, reversed its earlier decision and held that the search violated the Fourth Amendment. The Court of Appeals in *Schleis* found that the search had been conducted after the briefcase had come under the exclusive dominion of the police:

> "The briefcase came under the 'exclusive control' of the police at the time of the arrest when Schleis was handcuffed and taken into custody. The search, however, was conducted at the Burnsville jail well after the arrest and after Schleis had been locked in a jail cell. Since the evidence locker was available in which the briefcase could have been securely placed, there was no reason to believe

that any evidence in the briefcase might be destroyed. Moreover, there was no reason to believe that the briefcase contained explosives or other danger instrumentalities."

*Schleis, supra* at 1172. Thus, the *Schleis* court concluded that the search could not be justified as incident to the arrest because it was remote in time and place from the arrest, and no exigent circumstances existed at the time of the search. For the reasons discussed earlier, the *Schleis* case is clearly distinguishable from the instant case.

Moreover, contrary to the defendant's conclusion, this Circuit has not previously held that *Chadwick* changed the law concerning the applicability of the doctrine of searches incident to arrest to personal effects, such as attache cases. The defendant cites *United States v. Berry* as support for this conclusion, but this Court merely decided in *Berry* that *Chadwick* did not apply retroactively.[13]

Nor is there any indication in *Chadwick* that the Supreme Court overruled its previous decisions concerning the search incident to arrest doctrine. Indeed, referring to the legitimacy of warrantless searches conducted incident to custodial arrests, the Court observed:

---

12. *See, e. g., United States v. Gaultney*, 581 F.2d 1137 (5th Cir. 1978) (warrantless search of taped box discovered inside automobile held lawful due to probable cause and exigent circumstances); *United States v. Finnegan*, 568 F.2d 637 (9th Cir. 1977) (warrantless search of suitcase in automobile not violative of Fourth Amendment); *Hauser v. Washington*, 19 Wash. App. 506, 576 P.2d 420, *cert. denied* 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 773 (1979) (warrantless search of suitcase seized at airport proper as incident to arrest); *People v. DeSantis*, 46 N.Y. 82, 412 N.Y.S.2d 838, 385 N.E.2d 577 (1978) (warrantless search of luggage seized incident to lawful custodial arrest reasonable under circumstances); *Dawson v. State*, 40 Md.App. 640, 395 A.2d 160 (1978) (warrantless search of purse justified as incident to arrest); *Cooper v. Commonwealth*, Ky. App., 577 S.W.2d 34 (1979) (warrantless search of razor case found in automobile reasonable with probable cause and exigent circumstances); *Runkles v. Connecticut*, Conn., 389 A.2d 730, *cert. denied* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168 (U.S. Sept. 12, 1978) (search of

briefcase on backseat of automobile at time of arrest justified by exigent circumstances).

*But cf. United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979) (warrantless search of duffle bag found in airplane violative of the Fourth Amendment); *People v. Hamilton*, 74 Ill. 457, 24 Ill.Dec. 849, 386 N.E.2d 53 (1979) (warrantless search of briefcase not justified as inventory search).

13. *United States v. Berry*, 571 F.2d 2 (7th Cir. 1978), in which the Court vacated its earlier decision that the search violated the Fourth Amendment. Indeed, other decisions of this Court, both before and after *Chadwick*, would seem to indicate a contrary conclusion with respect to the applicability of *Chadwick* in this context. *See, e. g., United States v. Issod*, 508 F.2d 990 (7th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975); *United States v. Griffith*, 537 F.2d 900 (7th Cir. 1976); *United States v. Simmons*, 567 F.2d 314, 317–320 (7th Cir. 1977).

"When a custodial arrest is made, there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed. To safeguard himself and others, and to prevent the loss of evidence, it has been held reasonable for the arresting officer to conduct a prompt, warrantless 'search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' *Chimel v. California*, 395 U.S., at 763, 89 S.Ct. 2034. ' *See also Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Such searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence. The potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Terry v. Ohio, supra*."

*Chadwick, supra* 433 U.S. at 14–15, 97 S.Ct. at 2485.

Under facts quite similar to the instant case, the Supreme Court held in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), that an immediate search of luggage carried by an arrested person is reasonable under the Fourth Amendment. In *Draper*, a federal agent with the Bureau of Narcotics in Denver, Colorado, learned from an informant, whose information the agent had always found to be reliable and accurate, that the defendant was trafficking in narcotics, had departed by train for Chicago to obtain a supply of heroin, and would return to Denver on a certain train on a specific day or the following day. The defendant, whom the agent did not know, was described in detail to the agent by the informer. Acting on this information, the agent and a Denver police officer went to the Denver Union Station to look for an individual arriving on an incoming Chicago train who matched the description tendered by the informant. On the second day of surveillance, the agent immediately recognized the defendant as he disembarked from an inbound Chicago train. The agent and the police officer followed the defendant to a station exit, where he was stopped and, without a warrant, placed under arrest. The officers then undertook a search of the defendant's person and a tan zipper bag he carried in one hand, which resulted in a seizure of narcotics and a hypodermic syringe. The defendant was then taken into custody, and subsequently convicted of violating a federal narcotics law.

Confronted with these facts, the Court affirmed the conviction, holding:

"We believe that, under the facts and circumstances here, [Agent] Marsh had probable cause and reasonable grounds to believe that petitioner was committing a violation of the laws of the United States relating to narcotic drugs at the time he arrested him. The arrest was therefore lawful, and the subsequent search and seizure, having been made incident to that lawful arrest, were likewise valid. It follows that the petitioner's motion to suppress was properly denied and that the seized heroin was competent evidence lawfully received at the trial."

358 U.S. 307, 314, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (footnote omitted).

Finally, the First Circuit opinion in *Chadwick* provides further evidence that the Supreme Court did not expand the exclusionary rule to encompass the search in that case when it affirmed the Court of Appeals decision. In holding the warrantless search of the footlocker violated the Fourth Amendment, the First Circuit stated:

"Applying *Chimel*, we find no error in the lower court's decision that the footlocker was not an area within the arrestee's immediate control. In so holding, the district court rejected the Government's attempt to analogize the footlock-

er search to that of hand-carried briefcases and other luggage, searches of which various courts have approved. *See Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) . . . . The district court said:

'. . . In all of these cases, the luggage that was searched was being carried by the defendant at the time of his arrest. It may be that the hand-carried luggage is encompassed in the phrase "area within his immediate control." But the footlocker in this case was not hand-carried luggage . . .'

Since the decision below, this circuit has also upheld a warrantless search of a hand-carried briefcase at the scene of the arrest, after the arrestee was handcuffed and in custody. *United States v. Eatherton*, 519 F.2d 603, 610–11 (1975). However, we must agree with the district court that there is considerable difference between items such as Eatherton's hand-carried briefcase and the footlocker here. Portable objects in hand such as zipper bags, briefcases and small suitcases, fit without too much difficulty into *Chimel's* 'immediate control' standard. Their size, accessibility, and portability all liken them to 'personal effects' found on an arrestee's person, such as clothing or a cigarette package in one's pocket, which may lawfully be searched without a warrant as incident to an arrest. *See United States v. Robinson, supra; United States v. Edwards, supra.* To exclude searches of such items can create 'gossamer thin' distinctions which arresting officers could find impracticable, if not impossible, to follow; and, where the justification for a search depends to a great extent on the reasonable judgments which the arresting officers could have made at the time of arrest, *see United States v. Robinson, supra*, those distinctions would appear unwarranted.

"However, a two hundred pound footlocker is quite different. It is difficult to liken this footlocker to a hand-carried bag and say in any meaningful sense that the footlocker or, more importantly, its contents, were under defendants' immediate control. It was far from portable, and too heavy even to be carried by the average person. It had also, as the agents well knew, just been unloaded from a train's baggage car after a cross-country trip suggesting, as proved to be the case, that it was tightly secured and could not be opened; nor did the agents observe it open before they themselves opened it. We thus see no basis for disturbing the court's finding that, for purposes of the *Chimel* standard, 'this footlocker was simply not within the control of the defendants at the time of arrest.' "

532 F.2d 773, 780–781 (1st Cir. 1976) (footnotes omitted).

Thus, the First Circuit merely held that the footlocker was not within the immediate control of the defendant at the time of the arrest, and since the subsequent warrantless search of its contents was remote in time and place from the arrest, it therefore could not be justified as incident to the arrest. Accordingly, we regard the Supreme Court opinion in *Chadwick* as simply confirming the validity of this analysis in light of the facts presented by that case.

Nor do we regard the Supreme Court's recent decision in *Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), as dispositive of this appeal. In *Sanders* the Court expressly declined to consider the constitutionality of warrantless searches of luggage conducted incident to the arrest of its possessor. *Sanders, supra*, at ——, n.11, 99 S.Ct. 2586.

## IV

Unquestionably, the Fourth Amendment embodies one of the most cherished rights enjoyed by free people, and, as the Supreme Court noted in *Chadwick*, the warrant clause "protects people from unreasonable government intrusions into their legitimate expectations of privacy." Nevertheless, we conclude that the search challenged here was justified as incident to a lawful, custodial arrest, and was therefore reasonable within the meaning of the Fourth Amendment.

Accordingly, for the reasons herein expressed, the judgment of conviction appealed from is affirmed.

AFFIRMED.

SPRECHER, Circuit Judge, concurring.

I concur in the affirmance of the district court's denial of the defendant's motion to suppress evidence, but do so solely on the basis of *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), permitting certain warrantless searches incident to an arrest, and its interpretation in *United States v. Patterson*, 447 F.2d 424, 425–6 (10th Cir. 1971), *cert. denied*, 404 U.S. 1064, 92 S.Ct. 748, 30 L.Ed.2d 752 (1972) (folder or envelope 4 to 6 feet away from arrestee); *United States v. Wysocki*, 457 F.2d 1155, 1160 (5th Cir.), *cert. denied*, 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972) (box 6 feet away from arrestee). In this case, when the arrestee was necessarily moved out of the flow of traffic, she became separated momentarily from her luggage by 4 to 6 feet, and when the luggage was also necessarily moved out of the traffic flow, it was brought back to 1 to 2 feet from the arrestee. The search occurred within 15 seconds of the arrest, distinguishing these facts from *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

SWYGERT, Circuit Judge, dissenting.

I dissent. The majority holds that the warrantless search of Brunilda Garcia's luggage was not conducted in violation of her Fourth Amendment right to be free from unreasonable searches and seizures. This holding is supported by an opinion which misinterprets the Supreme Court's holding in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and which asserts the existence of exigent circumstances when the Government itself concedes that there were none and the facts reveal that the agents involved did not act as if any exigency were present. By ignoring the distinction between a search of the person and a search of the area within the control of the arrestee and by failing to recognize the increased invasion of privacy that a search constitutes over a mere seizure, the majority opinion has sacrificed reason to result.

I

Initially, a preliminary matter must be confronted. The district court apparently denied the defendant's motion to suppress on the ground that no legitimate privacy interests were implicated by the search. Although the majority relegated this issue to a footnote, *supra*, p. 355, n. 8, this error should not be allowed to escape uncorrected.

The district court's conclusion that no Fourth Amendment rights are involved here is based on the notion that because the luggage may have been subject to search at embarkation, no privacy interest remains thereafter. It is as if all legitimate privacy interests are waived once a person decides to embark on a trip involving air travel. While it may be true that an air traveller is faced with the option of either consenting to a limited search for weapons or explosives upon entering certain sections of an airport or not going into those sections, such limited consent to a search forced by the circumstances surrounding air travel does not amount to consent to be searched outside an airport for possession of contraband. Consent to search given to certain authorities does not justify a search conducted by other authorities to whom the consent was not given. *United States v. Glasby*, 576 F.2d 734 (7th Cir.), *cert. denied*, 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 159 (1978).[1] In *Chadwick* the Supreme Court noted that even though luggage may be searched as a condition to border entry or common carrier travel, the significant privacy interest in personal luggage remains otherwise undiminished. *Chadwick, supra*, 433 U.S. at 13, 97 S.Ct. 2476. And just last term in *Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the Supreme Court upheld a state supreme

---

1. In *Glasby* we held this to be true even when the other authorities not receiving the consent limited their search to the place defendant had originally consented to be searched.

court decision overturning a conviction based on contraband seized pursuant to a search of luggage (albeit in a taxi cab several blocks from the airport) which moments before had been retrieved from the airport baggage claim. *Id.* at ——, 99 S.Ct. 2586. *See also id.* at ——, 99 S.Ct. at 2594 (Burger, C.J., concurring). It therefore should be clear that the Fourth Amendment applies to personal luggage being carried out of an airport.

## II

Given the applicability of the Fourth Amendment, a fact the majority at least tacitly concedes, the warrantless search in this case is reasonable only if it may be categorized as a search incident to a lawful arrest for which no warrant is required. To fall within the "search incident" exception to the warrant requirement, the search must be classifiable either as a search of the person or of objects immediately associated with the person of the arrestee, following *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), or as a search of objects in an area within the control of the arrestee under *Chimel v. California*, 396 U.S. 72, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Before examining the importance of the distinction between *Robinson* and *Chimel* to the instant case, it is necessary to review the *Chadwick* decision. In *Chadwick* the Supreme Court was asked a question very similar to that before us today: "[w]hether a search warrant is required before federal agents may open a locked footlocker which they have lawfully seized at the time of the arrest of its owners, when there is probable cause to believe the footlocker contains contraband." 433 U.S. at 3, 97 S.Ct. at 2479.

The facts of *Chadwick*, decided ten days prior to the events at the airport in the instant case, are indeed similar to those before us. Federal agents in Boston observed the defendants disembark from a train, which they had boarded in San Diego, and claim a footlocker from baggage. The agents had been alerted by Amtrak officials in San Diego to the possibility that the footlocker contained marihuana. After a trained dog detected the presence of marihuana, the agents watched the defendants load the footlocker into a car and then arrested them. The agents took the defendants and the footlocker to the federal building, where, without obtaining consent or a search warrant, they searched the footlocker an hour and a half after the arrest and found marihuana. From the moment of arrest, the footlocker had remained under the exclusive control of law enforcement officers. "The agents had no reason to believe that the footlocker contained explosives or other inherently dangerous items, or that it contained evidence which would lose its value unless the footlocker were opened at once. Facilities were readily available in which the footlocker could have been stored securely; it is not contended that there was any exigency calling for an immediate search." *Id.* at 4, 97 S.Ct. at 2480.

After reciting these facts, the Supreme Court held that the warrantless search of the footlocker violated the Fourth Amendment. The Court rejected the Government's argument that the Fourth Amendment Warrant Clause is not implicated when a search is made of personal effects lawfully seized in public areas on probable cause; instead, it reiterated the principle that "a fundamental purpose of the Fourth Amendment is to safeguard individuals from unreasonable government invasions of legitimate privacy interests." *Id.* at 11, 97 S.Ct. at 2483.

As to the *Robinson* argument, the Court noted that searches of personal possessions do not fall within the *Robinson* rationale:

Unlike searches of the person, *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 77 (1974), searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by arrest. Respondents' privacy interest in the con-

tents of the footlocker was not eliminated simply because they were under arrest. *Id.* at 16 n. 10, 97 S.Ct. at 2486 n. 10.

Nor could the *Chimel* rationale be used to legitimize the warrantless search of the luggage. Unlike a *Robinson* search of the person, which is based on a reduced expectation of privacy following arrest, a *Chimel*-type search is based on the premise that an arrestee may endanger the arresting officer by seizing a weapon or may gain possession of and destroy evidence. As the Supreme Court stated in *Chadwick*, warrantless searches cannot be justified by the *Chimel* rationale once the item to be searched has come under the exclusive control of the authorities and there is no exigency:

> [W]arrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the "search is remote in time or place from the arrest," *Preston v. United States*, 376 U.S., at 367, 84 S.Ct. 881, or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

433 U.S. at 15, 97 S.Ct. at 2485.[2] Thus, it is clear that if the search is remote in time or place from the arrest, *or* if no exigency exists, a warrantless search of luggage seized at the time of an arrest cannot be justified as incident to that arrest. Put

another way, even though in the instant case the search was not remote in time or place, if no exigency existed a warrantless search could not be justified under *Chimel* as incident to an arrest.

The majority attempts to distinguish the warrantless search and seizure in this case from that in *Chadwick* by focusing on irrelevant factual dissimilarities and by distorting the legal principles which animated that decision. Any suggestion that the factual differences between *Chadwick* and this case were sufficiently significant to compel different results should have been laid to rest by the Supreme Court's recent decision in *Sanders, supra.*[3] The majority in the instant case noted the factual distinctions it found relevant:

> In *Chadwick*, the object seized was a cumbersome, two hundred pound, double-locked footlocker, which obviously could be neither quickly opened nor rapidly removed by the defendants or an accomplice at the time of arrest. It is also significant that the search itself was not undertaken in close proximity to the time and place of the arrest and seizure. Rather, the footlocker was opened more than one hour following the arrest, and then only after it had been removed along with the defendants to the police station. Moreover, since the defendants were incarcerated, the only persons present at the time of the search were policy officers. Under these circumstances, ample justification existed to delay the search until a warrant could be obtained.

The factual circumstances governing the search in the instant appeal are in

---

2. The Court observed in a footnote:

> Of course, there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon.

433 U.S. at 15, n. 9, 97 S.Ct. at 2485 n. 9. In the instant case, the Government concedes that no such exigency existed at the time of the search.

3. The majority opinion discounts the relevancy of the Supreme Court's decision in *Sanders* because the Court in *Sanders* expressly noted that it was not considering searches of luggage incident to the arrest of its possessor. In both *Sanders* and this case, however, the officials, based on probable cause to believe the suspect was carrying contraband, first restricted the subject's freedom of movement and then searched the suspect's luggage. Whether this technically is characterized as an "arrest" or not should have no bearing on the validity of the search under the Fourth Amendment.

marked contrast. The objects seized consisted of two hand-carried, portable suitcases, which were quite capable of being opened quickly by the defendant in order to gain access to a weapon or evidence, or removed by a waiting accomplice of the defendant. Unlike the search in *Chadwick*, the search in this case was undertaken immediately upon the defendant's arrest. The officers approached the defendant as soon as she exited the baggage terminal building, placed her under arrest, seized the luggage she carried, and undertook a search of its contents in the defendant's presence and within fifteen seconds of the announcement of the arrest.

*Supra*, p. 353 (footnotes omitted).

The Supreme Court's decision in *Sanders* demonstrates that none of these factual circumstances has any determinative Fourth Amendment relevance. In *Sanders* the contraband was found, as in this case, by officials searching a portable suitcase. The Supreme Court said,

The facts of the two cases are similar in several critical respects. In *Chadwick*, a locked, 200-pound footlocker was searched without a warrant after the police, acting with probable cause, had taken it from the trunk of a parked automobile. In the present case, respondent's *comparatively small, unlocked suitcase* also had been placed in the trunk of an automobile and was searched without a warrant by police acting upon probable cause. *We do not view the difference in the sizes of the footlocker and suitcase as material here; nor did respondent's failure to lock his suitcase alter its fundamental character as a repository for personal, private effects. Cf.* Note, A Reconsideration of the Katz Expectation of Privacy Test, 76 Mich.L.Rev. 154, 170 (1977).

*Id.,* —— U.S. at ——, n. 9, 99 S.Ct. at 2592 n. 9 (emphasis added). And in *Sanders*, as in this case, the search occurred at the same time and place as the arrest. *Id.* at ——, 99 S.Ct. 2586. The defendant in *Sanders*, unlike the defendant in *Chadwick* but like the defendant in this case, had not been incarcerated, and at least one other person (the taxi driver) was present for the search. Any attention at all to the Supreme Court's decision in *Sanders* should have dispelled any significance attached to the factual differences between *Chadwick* and this case.[4]

The majority's analysis of the legal principles established by *Chadwick* is no more persuasive. The majority opinion completely misinterprets the simple rule articulated in *Chadwick* which describes when a warrantless search of luggage can be justified. The explicit language of *Chadwick* states:

[W]arrantless searches of luggage or other property seized at the time of an arrest *cannot be justified* as incident to that arrest *either* if the "search is remote in time or place from the arrest," *Preston v. United States*, 376 U.S., at 367, 84 S.Ct. 881 *or* no exigency exists.

433 U.S. at 15, 97 S.Ct. at 2485 (emphasis added). Yet the majority says,

*Chadwick* held that, where probable cause to arrest is present, a warrantless search of luggage seized at the time of the arrest is justified unless the search is either remote in time or place from the arrest, or no exigency exists. 433 U.S. at 15. Thus, even assuming no exigency attended the arrest in this case, the search was proper since it was contemporaneous with the arrest.

*Supra*, p. 356, n. 11. Admittedly, the majority opinion does go on to discuss the existence of exigent circumstances, but its reasoning in that regard is flawed as well.

---

**4.** The failure to follow clear and recent Supreme Court precedent is starkly evidenced in the concurring opinion. That opinion distinguishes *Chadwick* solely on the grounds that "the search [in this case] occurred within 15 seconds of the arrest, distinguishing these facts from *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)." Yet *Sand-* ers demonstrates that the *Chadwick* rule applies whether the search is contemporaneous with the arrest (as in *Sanders*) or occurs after a delay (as in *Chadwick*). Thus the only distinction between *Chadwick* and this case offered by the concurring opinion has been demonstrated to be irrelevant by *Sanders*.

Under a proper reading of *Chadwick*, before reaching the question of the presence of exigent circumstances, one must first decide whether the property searched was "not immediately associated with the person of the arrestee." 433 U.S. at 15, 97 S.Ct. at 2485. Ironically Judge Bauer, author of the majority opinion, has already addressed this question and others in a case closely related to the instant one.[5] That case involved the warrantless search of an attaché case which had been taken from an arrestee. Because Judge Bauer's interpretation and application of *Chadwick* in that case are both well reasoned and extremely relevant to this action. I take the liberty of quoting him at length:

> The more difficult issue presented here is whether the attaché case was "immediately associated with the person of the arrestee." If it was, the later search could be justified as a search of the arrestee's person, which need not be undertaken contemporaneous with the arrest. *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Footnote 10 of the *Chadwick* opinion speaks to his matter:
>
> > "Unlike searches of the person, *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest. Respondents' privacy interest in the contents of the footlocker was not eliminated simply because they were under arrest." [433] U.S. at [16], 97 S.Ct. at 2486 n. 10.

At footnote 8, the Court explained the nature of the privacy interest in the locker:

> "Respondents' principal privacy interest in the footlocker was of course not in the container itself, which was exposed to public view, but in its contents. A search of the interior was therefore a far greater intrusion into Fourth Amendment values than the impoundment of the footlocker. Though surely a substantial infringement with respondents' use and possession, the seizure did not diminish respondents' legitimate expectation that the footlocker's contents would remain private." *Id.* at [13–14], 97 S.Ct. at 2485 n. 8.

The Court appears to be distinguishing—for purposes of whether a warrant is required to search property in police custody that was seized from a suspect at the time of the arrest—between searches of an arrestee's clothing, as in *Edwards*, or items that were in his pockets, as in *Robinson*, from searches of other possessions, such as luggage, that were within his immediate control. Warrantless searches of the former items after they come in police custody can be characterized as searches of the arrestee's person because they do not involve any greater reduction in the arrestee's expectations of privacy than that caused by the arrest itself. Warrantless searches of the latter items, however, affect privacy interests other than those reduced by the arrest itself and thus can be conducted only so long as the danger exists that the arrestee might gain access to the property to seize a weapon or destroy evidence.

This distinction seems to be a new one that conflicts with language in *Edwards*

---

5. The case was *United States v. Berry*, 560 F.2d 861 (7th Cir. 1977). Although this court's disposition of the case was later vacated, 571 F.2d 2 (7th Cir.), *cert. denied*, 439 U.S. 848, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978), the reasoning of Judge Bauer's opinion remains in the public domain. Moreover, and somewhat paradoxically, the subsequent vacation serves to affirm the relevance of Judge Bauer's first opinion to the instant case. In the original *Berry* decision, the court felt that *Chadwick* was controlling and therefore took pains to interpret and apply it to the facts at hand. On rehearing, however, it was decided that *Chadwick* was not to be applied retroactively, and for that reason alone the original decision was vacated. *See* text accompanying note 14 to the majority opinion.

suggesting that officers may search at any time after an arrest any item that could have been searched at the time of arrest:

> "Once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence on the other." 415 U.S. at 807, 94 S.Ct. at 1239.

It was on the basis of this language that several courts of appeal had held prior to *Chadwick* that briefcases and similar items possessed by arrestees may be searched at a later time. E. g., *United States v. Battle,* 166 U.S.App.D.C. 396, 510 F.2d 776, 777–79 (1975); *United States v. Schleis,* 543 F.2d 59, 61–62 (8th Cir. 1976). By its *Chadwick* decision, the Court now appears to have limited *Edwards* to its own facts.

Returning to the instant case, we believe that the search of the attaché case is better characterized as a search of possessions within the arrestee's immediate control than as a search of his person. First, as a matter of common usage, a briefcase is not an item carried on an individual's person in the sense that his clothing or items found in his pocket are. Second, as was true of the footlocker in *Chadwick,*

the privacy interest in the attaché case here centered on its contents rather than on the container itself. A search of the interior constituted "a far greater intrusion into Fourth Amendment values" than either Wilson's arrest or the impoundment of the case. Finally, unlike a purse that might be characterized as "immediately associated with the person of the arrestee" because it is carried with the person at all times, the attaché case here was more like luggage in that Wilson was not carrying it when he left the building, but rather removed it from an auto trunk immediately before his arrest. The warrantless search of the attaché case in police custody thus cannot be justified as a search of Wilson's person. 560 F.2d at 863–64.

Judge Bauer's own clear reasoning as to the nature of an attaché case applies *a fortiori* to luggage such as the suitcases here involved.[6] It is here that the distinction between *Robinson* and *Chimel*-type search justifications becomes relevant. Inasmuch as the suitcases do not fall within the *Robinson* rubric, the warrantless search of them was reasonable and thus constitutional only if an exigency existed.

The majority opinion's treatment of this issue, which is the crucial and determinative one given a proper reading of *Chadwick,* is inexplicable. The majority opinion first cavalierly dismisses the Government's concession in open court that no exigent circumstances were present.[7] It does so by stating

---

6. Perhaps it was a failure to observe this distinction which led Judge Sprecher to base his concurrence on an application of *Chimel.* The Court in *Chadwick,* however, was careful to note the difference. After first discussing and in fact quoting from *Chimel,* 433 U.S. at 14, 97 S.Ct. at 2485, the Court held that a search of "luggage or other personal property not immediately associated with the person of the arrestee" is not automatically validated by mere reference to *Chimel* and the "search incident" doctrine. Rather, if no exigency is present, reduction to the exclusive control of the agents means that "a search of that property is no longer an incident of the arrest," 433 U.S. at 15, 97 S.Ct. at 2485, and hence not validated by *Chimel.*

7. At oral argument the Government gave these explicit answers to the court's questions:

Question (by the court): "Were they [the agents] in danger?"
Answer (by the Government): They were not in danger."

\* \* \* \* \* \*

Question: "How could she destroy evidence if they already had it [in their control] six feet away from her?"
Answer: "I think that that would be very difficult."

\* \* \* \* \* \*

Question: "How can the danger be here when the suitcases are six feet away from this woman and she's surrounded by officers?"

that "[t]he Fourth Amendment standard of reasonableness does not rise or fall on the detached observations of the prosecutors or the courts as to whether an exigency existed at the time of the arrest. It must be based upon a subjective analysis of the situation confronting the arresting officer." *Supra*, at p. 356. After devolving upon the arresting officer the judiciary's responsibility to evaluate violations of the Fourth Amendment, the majority opinion states in a conclusory manner that the "operative factual setting" shows exigent circumstances to have been present. Not only does the opinion attempt to support this conclusion by an argument specifically rejected by the Supreme Court in *Chadwick,* but it does not even follow from the majority opinion's own "subjective analysis" as made by the arresting officer.

The majority opinion states: "[E]xigent circumstances did attend the arrest in this case. The police officers had probable cause to believe that an offense was being committed and that the defendant was in possession of evidence of the crime at the time of arrest. . . . Certainly, the fact that the arrest was effected in public . . . supports the officers' judgment to undertake an immediate search of the luggage." *Supra*, at p. 356 (footnote omitted). In *Chadwick* the Court had the same argument before it ("Finally, the Government urges that the Constitution permits the warrantless search of any property in the possession of a person arrested in public, so long as there is probable cause to believe that the property contains contraband or evidence of crime." 433 U.S. at 14, 97 S.Ct. at 2485), and rejected it. *Id.* at 14–16, 97 S.Ct. 2476.[8]

The majority opinion's reference to the subjective analysis of the arresting officer is equally unsupportive of its conclusion, for that officer's own testimony clearly reveals that he did not treat the situation as exigent. Even before defendant was placed under arrest—in fact, as soon as she was told to stop by the arresting officer—she was so frightened that she dropped the suitcases, threw up her hands, and urinated uncontrollably on her clothing. The officer took her by the arm and led her off to one side.[9] After placing her under arrest, the officer did not immediate handcuff her or require her to assume the appropriate position for a "pat down" search for weapons or destructible evidence. Far from being concerned with any exigency, he instead was concerned with the possible embarrassment of the women over her soiled clothing. He took her jacket, which was draped over her handbag, and tied it around her in the manner of an apron to hide her clothing. In fact, not only did he leave her hands free while he did this, he even allowed her to help him.[10] These may be the actions of a compassionate man, but they certainly are

Answer: "Well, Judge, we conceded that there were no exigent circumstances."

8. This position was reiterated by the concurring Justices in *Sanders, supra,* —— U.S. at ——, 99 S.Ct. at 2594 (emphasis added):

The essence of our holding in *Chadwick* is that there is a legitimate expectation of privacy in the contents of a trunk or suitcase accompanying or being carried by a person; *that expectation of privacy is not diminished simply because the owner's arrest occurs in a public place.* Whether arrested in a hotel lobby, an airport, a railroad terminal, or on a public street as here, the owner has the right to expect that the contents of his luggage, will not, without his consent, be exposed on demand of the police. . . . [Persons arrested in public places] may stand on their right to privacy and require a search warrant.

9. Although the majority opinion states that the distance from where the suitcases were dropped to the place where Garcia was taken was four feet, the concurring opinion correctly reflects the testimony of the agents that it was from four to six feet. *See, e. g.,* transcript of suppression hearing at 27.

10. Question (by Government counsel): "And what happened after you got out of the way of the people?"

Answer (by Agent Foster): "She had soiled her clothing and she was crying and it was a little bit embarrassing for her, so I removed the leather jacket that was on top of the purse and fashioned an apron out of it and hanged the body of the jacket in front of her waist and she assisted me in tying the sleeves like an apron string behind her back to conceal her clothing." Transcript of suppression hearing at 27.

not the actions of an arresting officer on the scene who perceives any danger that weapons might be grabbed or evidence destroyed.

Meanwhile the other agents present at the scene of the arrest [11] had taken control of the suitcases. The majority quibbles with the question of "exclusive" control, but the fact that the suitcases [12] were held by one agent in the company of two others (while the fourth, actually with the defendant, was not concerned with exigencies) cannot be regarded as anything except exclusive control.

The majority claims that the agents in this case had not reduced the luggage to exclusive control as that phrase was used in *Chadwick,* citing the following passage from that opinion as support:

> Here the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency. 433 U.S. at 15, 97 S.Ct. 2476.

*Supra,* at p. 355. From the face of this quote alone it is clear that the Court observed that exclusive control was gained by the agents more than an hour before the search in question. In fact, the Court stated that "[a]s the Government concedes, *from the moment of respondents' arrest* at about 9 p. m., the footlocker remained under the exclusive control of law enforcement officers at all times." 433 U.S. at 4, 97 S.Ct. at 2480 (emphasis added).[13] Likewise, in *Sanders,* in which the search occurred contemporaneously with the arrest and in the presence of the defendant, the Court stated:

> Here, as in *Chadwick,* the officers had seized the luggage and had it exclusively within their control at the time of the search. Consequently, "there was not the slightest danger that [the luggage] or its contents could have been removed before a valid search warrant could be obtained." 433 U.S., at 13, 97 S.Ct. 2476.

*Sanders, supra,* —— U.S. at ——, 99 S.Ct. at 2592.

It thus cannot reasonably be questioned that the suitcases were within the exclusive control of the agents and that no exigent circumstances were present at the time the warrantless search took place.[14] This being

---

11. A total of four agents were immediately present while others at the airport had Saul Valentin secured in a police vehicle.

12. One of which was zippered shut and the other was zippered, latched, and buckled. Transcript of suppression hearing at 45.

13. The majority opinion uses this same logic to distinguish *United States v. Schleis,* 582 F.2d 1166 (8th Cir. 1978) (*en banc*). It quotes the Eighth Circuit as stating that "[t]he briefcase came under the 'exclusive control' of the police at the time of the arrest when Schleis was handcuffed and taken into custody," *id.* at 1172, *supra,* at p. 357 (emphasis added), yet fails to note that the exclusive control attached at the time of arrest. Moreover, the fact that the *Schleis* search was remote in time and place from the arrest is not itself enough to distinguish the case, as has been pointed out in connection with *Chadwick.*

14. As has been pointed out, the Government concedes that no exigent circumstances were present to justify the search. Even assuming *arguendo* that any danger existed, it could only have been of the agents own making. After seizing the suitcases, instead of moving them to a location away from the defendant as prudence would seem to dictate, the agents moved them *nearer* to the defendant, in fact placing them virtually at her feet, despite the fact that there were enough agents to guard both the suitcases and the defendant separately. Judge Sprecher's concurrence relies on this movement of the luggage as support for the application of *Chimel.* Judge Bauer's majority opinion praises this seemingly illogical conduct by declaring that it "clearly constituted the exercise of sound judgment by the agents." *Supra,* at p. 356. But it should, of course, be self-evident that such "bootstrapping" by the Government cannot be used to make the warrantless search valid; the Government certainly cannot manufacture an exigency to avoid the warrant requirement. When the Government has itself created the "exigency" by which it seeks to justify a warrantless search under the *Chimel* doctrine, that doctrine may not be invoked to justify the search. *United States v. Griffith,* 537 F.2d 900 (7th Cir. 1976) (a pre-*Chadwick* case, the dicta from which regarding a warrantless search of personal property has been superseded by *Chadwick* ).

true, no amount of *post hoc* rationalization can change the constitutional requirement that a warrant first issue. The Supreme Court in *Chadwick* was very clear on this:

> Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. Respondents were therefore entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before their privacy interests in the contents of the footlocker were invaded.

433 U.S. at 15–16, 97 S.Ct. at 2486 (footnote omitted).

The majority opinion has vitiated the warrant requirement for official searches of the luggage and briefcases of persons who have been arrested. The majority apparently believes that the warrant requirement in such situations is the exception rather than the rule, and an exception whose applicability is to be determined by the "subjective" assessment of the official on the scene. Nothing could be further from the truth. As the Supreme Court stated last term:

> By requiring that conclusions concerning probable cause and the scope of a search "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime," *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), we minimize the risk of unreasonable assertions of executive authority. *See McDonald v. United States,* 335 U.S. 451, 455–456, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

\* \* \* \* \* \*

Thus, a few "jealously and carefully drawn" exceptions provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate. *United States v. United States District Court* [407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)]. But because each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and "the burden is on those seeking the exemption to show the need for it." *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951). *See Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Katz v. United States* [389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)] (footnotes omitted).

*Sanders, supra,* —— U.S. at ——, 99 S.Ct. 2586. If the Government has carried its burden of demonstrating the need for an exception to the warrant requirement in this case, it is difficult to imagine any arrest situation in which the warrant requirement would be operative. The four agents surrounding the defendant had removed the suitcases from her reach (four to six feet away), only to return them to her feet immediately prior to the search. The Government conceded that no exigent circumstances were present. And the "exigent" circumstance that seemed most to concern any agent at the scene of the arrest was the commendable and humane decision to minimize the embarrassment of the crying defendant who had just soiled her clothing.

The Supreme Court's conclusion in *Sanders* is cast in simple terms:

> Where—as in the present case—the police, without endangering themselves or risking loss of the evidence, lawfully have detained one suspected of criminal activity and secured his suitcase, they should delay the search thereof until after judicial approval has been obtained. In this way, constitutional right of suspects to prior judicial review of searches will be fully protected.

—— U.S. at ——, 99 S.Ct. at 2594. I would be hardpressed to concoct a set of facts

which more neatly would fall within the ambit of this rule than the circumstances of the instant case. The agents should have delayed their search of defendant's luggage until after judicial approval had been obtained.

Accordingly, I would reverse the district court's order denying defendant's motion to suppress.